**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EMILIANO FRANCISCO MARTINEZ,

    Defendant - Appellant.

No. 15-8019

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 1:14-CR-00274-ABJ-1)**
_____

Grant Russell Smith, Research & Writing Specialist, Office of the Federal Public Defender, Cheyenne, Wyoming (Virginia L. Grady, Federal Public Defender, and Veronica S. Rossman, Assistant Federal Public Defender, Office of the Federal Public Defender, Denver, Colorado, with him on the briefs), for Defendant-Appellant.

Eric J. Heimann, Assistant United States Attorney, Office of the United States Attorney, Cheyenne, Wyoming (Christopher A. Crofts, United States Attorney, Office of the United States Attorney, Cheyenne, Wyoming, with him on the brief), for Plaintiff-Appellee.
_____

Before **HOLMES**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Emiliano Martinez pleaded guilty to possessing an unregistered, short-barrel shotgun in violation of federal law. 26 U.S.C. §§ 5841, 5845(a), (d), 5861(d), and

5871. Under his plea agreement, Martinez reserved the right to appeal his sentence if the district court determined that his total offense level was greater than 23 under the 2014 United States Sentencing Guidelines. The district court calculated his total offense level as 27 after applying a four-level enhancement for using or possessing a firearm in connection with another felony. U.S.S.G. § 2K2.1(b)(6)(B). Key to this enhancement was the district court's finding that Martinez had possessed a firearm in connection with another felony offense—a burglary of the home from which the shotgun Martinez later possessed was stolen.

On appeal, Martinez contends that the district court clearly erred at sentencing when it considered the hearsay statements of Eduardo Hernandez, who, in a police interview, had admitted to committing the burglary with Martinez. Martinez argues that Hernandez's hearsay statements lacked sufficient indicia of reliability to support their probable accuracy. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

A.    **Palomo Burglary**

On July 14, 2014, Arlo Palomo's home in Torrington, Wyoming was burglarized. The burglary was extensive, lasting several hours. A burglar even took time to eat a bowl of cereal. Among other items stolen was a Remington 870 12-gauge shotgun. Mr. Palomo told police that his ex-wife, June Palomo, had bought the shotgun at a Walmart in Scottsbluff, Nebraska. Inside the Palomo home, police found a fingerprint left by Eduardo Hernandez.

2

**B.      Discovery of a Short-Barrel Shotgun**

On July 23, 2014, nine days after the burglary, agents from the Wyoming Division of Criminal Investigation (DCI) and the U.S. Drug Enforcement Administration executed a search warrant—one unrelated to the Palomo burglary—on the car of Martinez's girlfriend, Amanda Dowers. In Dowers's car trunk, the agents found and seized a Remington 870 12-gauge shotgun with a 17-inch barrel.[1] A witness later told DCI that the shotgun belonged to Martinez.

Sometime after the agents executed the search warrant, U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agents Steve McFarland and Matthew Wright took possession of the shotgun and began investigating Martinez. The agents ran a trace on the shotgun's serial number and learned that June Palomo had bought the shotgun from a Walmart in Scottsbluff, Nebraska. Although this was consistent with Arlo Palomo's statements to Torrington police after the burglary, the record doesn't say whether Torrington police had advised the ATF agents about the Palomo burglary before the ATF agents ran the trace.

**C.      Interview with Martinez**

On September 26, 2014, two months after officers seized Martinez's short-barrel shotgun, Agents McFarland and Wright interviewed Martinez in Torrington. During the non-custodial interview, Martinez said that he obtained the shotgun from

---

[1] Under 26 U.S.C. §§ 5841 and 5845, shotguns with barrels less than 18 inches long must be registered in the National Firearms Registration and Transfer Record. Neither Martinez nor Dowers had registered any firearms, and the seized shotgun wasn't registered to any other person or entity.

an unidentified white male in a field "a couple months" before Dowers's arrest (so by his account he would have obtained it sometime near late May 2014). R. vol. 1 at 11. Martinez also told Agents McFarland and Wright that the barrel was already cut down when he obtained the shotgun and that he had put the shotgun in Dowers's car trunk the day that she was arrested. Further, Martinez said that he had previously buried the shotgun in the ground "because there was no need for [him] to be messing with it unless he needed it; and he would leave it buried until the appropriate time." *Id.* (alteration in original) (quotation marks omitted).

**D. Interviews with Hernandez**

On November 18, 2014, four months after the burglary, a Torrington police officer interviewed Hernandez about a string of local burglaries, including the Palomo burglary. At first, Hernandez denied any involvement in the burglaries. After leaving the interview room for "a few seconds," the Torrington police officer returned and "became more accusatory" in his questioning. R. vol. 3 at 39. Hernandez again denied any involvement in the burglaries. But during the same interview, Hernandez eventually admitted that he had burglarized the Palomo home and had stolen a shotgun during the burglary. The next day, Torrington police again interviewed Hernandez. During this second interview, Hernandez confirmed his earlier admissions. But this time Hernandez implicated Martinez in the burglary, too. Hernandez said that Martinez had stolen some tools while they were both there and that Martinez had returned to the Palomo home later in the day and had stolen additional property. Importantly, Hernandez told police that Martinez had several of

4

the firearms Hernandez had stolen. Torrington police memorialized both of the Hernandez interviews in written reports.

**E.     Martinez's Plea Agreement and Presentence Investigation Report**

Following a criminal complaint on October 8, 2014, and a preliminary hearing on October 15, 2014, a grand jury indicted Martinez on two counts: (1) felon in possession of a firearm (Count One), 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and (2) possession of an unregistered, short-barrel firearm (Count Two), 26 U.S.C. §§ 5841, 5845(a), (d), 5861(d), 5871. On December 17, 2014, Martinez agreed to plead guilty to Count Two, and the government agreed to dismiss Count One. Under the signed plea agreement, the parties agreed to a base offense level of 22 under U.S.S.G. § 2K2.1(a)(3).

The parties also agreed to the application of two separate enhancements. First, the parties agreed to recommend application of U.S.S.G. § 2K2.1(b)(4)(A), which adds two offense levels for possessing a stolen firearm. Second, the parties agreed to recommend application of U.S.S.G. § 2K2.1(b)(3)(B), which adds two offense levels for possessing a destructive device. Also under the plea agreement, the government agreed to "recommend the court grant a reduction of three offense levels reflect[ing] his acceptance of responsibility" under U.S.S.G. § 3E1.1. R. vol. 2 at 10. Martinez

5

reserved the right to appeal if the district court calculated his total offense level as greater than 23.[2]

On January 7, 2015, Torrington police informed ATF Special Agents McFarland and Wright about the Palomo burglary; that a shotgun had been stolen during that burglary; and that Hernandez had admitted to burglarizing the Palomo home with Martinez.

On February 6, 2015, the probation office issued Martinez's Presentence Investigation Report (PSR). As contemplated by the plea agreement, the PSR set Martinez's base offense level as 22 and included the two two-level enhancements for possession of a stolen firearm and possession of a destructive device. But the PSR included an additional four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B)—one unaddressed in the plea agreement—for Martinez's possessing a firearm in connection with another felony, reporting that "[Martinez] and [Eduardo] Hernandez burglarized a residence on July 14, 2014, and stole the firearm during the burglary."[3]

_____

[2] The plea agreement thus contemplated the district court setting a base offense level of 22, adding four levels for the agreed-upon enhancements, and subtracting three levels for acceptance of responsibility under U.S.S.G. § 3E1.1.

[3] U.S.S.G. § 2K2.1(b)(6)(B) provides that if the defendant

> used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, [the defendant's offense level will] increase by 4 levels.

Additionally, a particularly relevant application note provides that § 2K2.1(b)(6)(B) applies "in a case in which a defendant who, during the course of a burglary, finds

R. vol. 2 at 21. After subtracting two offense levels for accepting responsibility, U.S.S.G. § 3E1.1(a), and one level for assisting authorities in the investigation of his own misconduct by timely notifying authorities of his intention to enter a guilty plea, *id.* § 3E1.1(b), the PSR calculated Martinez's total offense level as 27.

The PSR also itemized Martinez's extensive criminal history. In addition to his other convictions, Martinez had pleaded guilty or no contest to six separate thefts between 2003 and 2011. All told, Martinez accumulated 21 criminal-history points, far more than the 13 needed for a criminal-history category of VI. The advisory Guidelines range for a total offense level of 27 and a criminal-history category of VI is 130 to 162 months' imprisonment. But the maximum sentence for possessing an unregistered, short-barrel shotgun is ten years' imprisonment. 26 U.S.C. § 5871. Thus, the advisory Guidelines range became 120 months' imprisonment. U.S.S.G. § 5G1.1(a).

Before the sentencing hearing, Martinez objected to the PSR's four-level enhancement for his possessing the shotgun in connection with the Torrington burglary, arguing that his alleged participation in the burglary was "not readily provable nor supported by credible evidence." R. vol. 2 at 39.

---

and takes a firearm, even if the defendant did not engage in any other conduct with that firearm during the course of the burglary." U.S.S.G. § 2K2.1, cmt. 14(B). On appeal, Martinez doesn't address whether § 2K2.1(b)(6)(B) requires that he personally have possessed the firearm during the burglary.

**F.      Sentencing Hearing**

On March 31, 2015, the district court held a sentencing hearing. To support the PSR's four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B), the government called Special Agent Wright as a witness. Agent Wright testified about ATF's investigation. He said that, soon after obtaining the shotgun, he ran a trace on its serial number and learned that June Palomo had bought the shotgun from a Walmart in Scottsbluff, Nebraska. Agent Wright also discussed what Martinez had told him during Martinez's interview. Finally, Agent Wright testified about portions of the Torrington police reports memorializing their interviews with Hernandez. Martinez's attorney objected to Agent Wright's testimony about the Torrington police reports, arguing that the "multiple hearsay is so unreliable that I object to any use of that to take this sentence from 92 months up to 120 months."[4] R. vol. 3 at 34. The district court overruled the objection.[5]

---

[4] Without the four-level enhancement, Martinez would have had a total offense level of 23 and a criminal-history category of VI, yielding an advisory range of 92 to 115 months' imprisonment.

[5] Of course, a district court may consider hearsay evidence at sentencing if the evidence has sufficient indicia of reliability to support its probable accuracy. *See United States v. Brewer*, 983 F.2d 181, 185–86 (10th Cir. 1993) ("[I]t is well-established that hearsay evidence is admissible at sentencing."); U.S.S.G. § 6A1.3(a) ("[A] court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). We interpret Martinez's objection at sentencing to mean that because of the multi-layered hearsay here, the evidence was so unreliable that it shouldn't have been considered under U.S.S.G. § 6A1.3(a).

On direct examination, with the Torrington police reports in hand, Agent Wright testified that Hernandez had admitted that he and Martinez together burglarized the Palomo home. On cross-examination, Agent Wright acknowledged that Hernandez initially denied any involvement in the burglary, that Hernandez later claimed that Martinez had "muscled" the shotgun from him sometime after the day of the burglary, and that Agent Wright had never spoken with Hernandez and wasn't present at Hernandez's interviews with the Torrington police. *Id.* at 38–40.

Despite having the Torrington police reports in front of him during his testimony at the sentencing hearing, the sentencing-hearing transcript reveals that Agent Wright wasn't fully versed in the reports' contents. At one point during his testimony, Agent Wright was asked whether Hernandez had admitted to taking the shotgun from the home. He responded, "If it's in the report, then yes." *Id.* at 41. In response to another question asking whether Hernandez had initially said that he hadn't committed the burglary, Agent Wright responded, "That's what is in the report as my understanding, yes, sir." *Id.* at 39. The government didn't introduce the Torrington police reports into evidence, and the reports aren't in the appellate record.

After Agent Wright testified, the government told the district court that it didn't "have other evidence in support of this offense characteristic." *Id.* at 46. After hearing argument on the applicability of the four-level enhancement, the district court found that Martinez had participated in the Torrington burglary, so it applied the enhancement. The district court explained its finding as follows:

The things I usually look for in . . . weighing statements such as the statement made by Mr. Hernandez would be what did he get out of it, was there some sort of promise of special treatment, the question not asked or evidence that wasn't developed here. Clearly, Mr. Hernandez went [into] the interrogation intending to see how far he could push it by way of denial, and when that did not seem to be working, especially given the fact that his fingerprint was discovered within the premises, he eventually came clean and made admissions that not only implicated him but implicated his coactor, the defendant in this matter . . . . Mr. Martinez made the poor choice not only to commit the burglary but to do it with Mr. Hernandez, who made admissions against his interest and, frankly, against his associate, backed up by the fact that Mr. Martinez was found in possession of the firearm not so—at a later period, and there was a statement that it was muscled by this defendant, Mr. Martinez, and chosen by him for the, for the taking.

*Id.* at 48–49. After applying the enhancement, the district court sentenced Martinez to the statutory maximum of ten years' imprisonment, which also was a within-Guidelines sentence under U.S.S.G. § 5G1.1(a). Martinez timely appealed.

**DISCUSSION**

Martinez challenges the district court's application of the four-level enhancement for his possessing the shotgun in connection with another felony. He contends that the evidence supporting the enhancement was so unreliable that the district court shouldn't have considered it. Specifically, Martinez argues that Hernandez's statements lacked sufficient indicia of reliability to support their probable accuracy. We conclude that the district court didn't clearly err in finding that Hernandez's statements implicating Martinez—especially when considered with all of the other evidence before the district court—had sufficient indicia of reliability to support their probable accuracy. Therefore, we affirm.

10

We review for clear error a district court's assessment of the reliability of evidence supporting a sentencing enhancement. *See United States v. Martinez-Jimenez*, 464 F.3d 1205, 1209–10 (10th Cir. 2006) ("We . . . conclude that the district court did not clearly err in finding that the evidence establishing [the defendant's] prior conviction was sufficiently reliable.").[6]

In arguing that the district court erred in considering Hernandez's hearsay statements, Martinez relies chiefly on *United States v. Fennell*, 65 F.3d 812 (10th Cir. 1995). In *Fennell*, we reversed a district court's four-level enhancement for using or possessing a firearm in connection with another felony. *Id*. at 814. The enhancement depended on our being willing to credit Fennell's ex-girlfriend's telephone account to a testifying probation officer that Fennell had shot a machine gun *at* her. *Id.* at 813. Felonious assault in Oklahoma depended on proof of "the intent to do bodily harm" or the "intent to injure." *Id*. Among the difficulties applying the enhancement, presumably, was that no one explained how Fennell could fire a machine gun *at* his girlfriend and miss. Although acknowledging that the girlfriend's account might be

---

[6] In view of this, the parties unsurprisingly apply the clear-error standard to the district court's evidentiary ruling made under U.S.S.G. § 6A1.3(a). But we wonder whether the abuse-of-discretion standard fits better. *See United States v. Alvarado-Martinez*, 556 F.3d 732, 735 (9th Cir. 2009) ("We review a district court's evaluation of the reliability of evidence used at sentencing for an abuse of discretion." (citing *United States v. Alvarado-Guizar*, 361 F.3d 597, 599–600 (9th Cir. 2004))). A ruling under § 6A1.3(a) resembles a ruling under the Federal Rules of Evidence, not a finding of fact. Regardless, we would affirm under either standard.

11

"potential truth," we saw problems with basing the enhancement "solely" on her account.[7] *Id.*

*Fennell* guides us in evaluating whether the district court clearly erred when it considered Hernandez's hearsay statements. In finding insufficient indicia of reliability in *Fennell*, we emphasized that "no other evidence . . . corroborates the account given the preparing officer." *Id.* In fact, we looked to the record to learn that Oklahoma authorities had charged Fennell with a misdemeanor, not a felony. *Id.* We took this as evidence that felonious intent to injure was lacking—meaning that Fennell hadn't tried to shoot his girlfriend with the machine gun. We declared that this "tends to undermine, rather than buttress, confidence in the girlfriend's hearsay statements." *Id.* But in Martinez's case, we have evidence helping to corroborate Hernandez's statements.

For starters, Hernandez knew that Martinez would have at least one firearm stolen from a burglarized home. Martinez downplays this fact, suggesting that by the time police interviewed Hernandez in mid-November, Hernandez could have learned about Martinez's arrest and charges, perhaps as early as October 15, 2014—the date of Martinez's preliminary hearing. But Martinez doesn't explain how Hernandez

---

[7] We said that "[t]he facts surrounding Mr. Fennell's arrest, while suggesting that the machine gun was fired during an altercation between Mr. Fennell and his girlfriend, do not answer the question of whether Mr. Fennell's actions constituted a felony or a misdemeanor." *Fennell*, 65 F.3d at 813. Because the government hadn't "bother[ed] to file the arrest report or even to summarize its contents with any particularity," we were "unable to determine if the girlfriend's contemporaneous statements to the state police support the story given the preparing officer [the probation officer who prepared the PSR]." *Id*. at 813 n.2.

would have known from this that Martinez's charged firearm came from one of the burglarized homes.

In addition, Martinez's possession of the shotgun nine days after it was stolen (the date law enforcement searched Dowers's car and arrested her) also provides some corroborative evidence of Martinez's involvement in the burglary. This is especially true given Martinez's actions during that nine-day period. For example, explaining the dirt on the shotgun when agents seized it, Martinez said that he had earlier buried it in a field but later unearthed it before putting it in Dowers's car trunk the day that she was arrested. These suspicious actions are consistent with Martinez's having obtained the shotgun from the Palomo home. Martinez also couldn't rationally explain how he came to possess the shotgun. Martinez's story about getting the shotgun "in a field" from "an unknown white guy" hardly inspires confidence—especially since he said that happened in late May 2014, long before the Palomo burglary. R. vol. 3 at 44. That Martinez lied about when (and likely where) he got the shotgun strongly suggests that he didn't want police talking to Hernandez.

Further, in assessing whether Hernandez's statements had sufficient indicia of reliability, the district court was entitled to rely on Martinez's long history of theft offenses—six separate guilty or no-contest pleas in less than ten years. *See United States v. Ruby*, 706 F.3d 1221, 1230 (10th Cir. 2013) ("While prior incidents are not necessarily probative of later conduct, Fed. R. Evid. 404(a), this type of evidence may help establish another piece of the minimal indicia of reliability necessary to

13

consider hearsay at sentencing." (citing *United States v. Damato*, 672 F.3d 832, 847 (10th Cir. 2012) (quotation marks omitted)).

Aside from the comparisons to *Fennell*, Martinez argues that Hernandez's statements are unreliable because they were inconsistent. Specifically, Martinez characterizes Hernandez's Martinez-muscled-me-out-of-the-shotgun story and the Martinez-was-with-me-when-I-burglarized-the-house story as conflicting accounts. But we agree with the district court that the two accounts were one, evolving story reluctantly making its way toward truth. The district court sensibly interpreted Hernandez's statements. Taken together, the corroborative evidence mentioned above provides additional support for the district court's determination that Hernandez's statements were probably accurate. We therefore conclude that the district court didn't clearly err when it considered the statements.

## CONCLUSION

The district court didn't clearly err when it considered Agent Wright's testimony regarding Hernandez's statements to Torrington police. Because of substantial corroborative evidence, the statements had sufficient indicia of reliability to support their probable accuracy. We therefore affirm the district court's consideration of Agent Wright's testimony and its application of the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B).