# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 9, 2018        Decided February 26, 2019

No. 17-3027

UNITED STATES OF AMERICA,
APPELLEE

v.

ALFREDO BELTRAN LEYVA, ALSO KNOWN AS MOCHOMO,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cr-00184-1)

---

*Stephen C. Leckar*, appointed by the court, argued the cause and filed the briefs for appellant.

*William A. Glaser*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Arthur G. Wyatt*, Chief. *Adrienne L. Rose*, Attorney, and *Elizabeth Trosman*, Assistant U.S. Attorney, entered appearances.

Before: ROGERS and SRINIVASAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge:* Alfredo Beltran Leyva pleaded guilty to conspiracy to distribute cocaine and methamphetamine in the United States. He later sought to withdraw his guilty plea and proceed to trial, but the district court did not permit him to do so. On appeal, Leyva claims the district court erred in denying his motion to withdraw the guilty plea; he also raises several challenges to his sentence and forfeiture order. We reject all his challenges and affirm the judgment of the district court.

## I. Background

The offenses to which Leyva pleaded guilty stem from a large-scale drug trafficking organization and the members' conspiracy to import various drugs into the United States through Mexico. Although Leyva admits the existence of and his participation in the conspiracy, he challenges the reliability and sufficiency of the evidence to support his sentence and the amount of the forfeiture ordered by the district court; therefore, we review the relevant facts in detail.

### A. Relevant Facts

Along with his brothers Arturo and Hector, Alfredo Beltran Leyva operated a drug trafficking organization (hereinafter a DTO) from at least 2000 to 2012. The DTO's cocaine business purchased cocaine from Colombian manufacturers through brokers and then shipped the drugs via land, air, or water for sale throughout Mexico; the cartel also imported some of that cocaine to the United States at the Texas border. The cartel also produced methamphetamine in laboratories in Mexico and shipped the finished drugs to the

United States. In order to maintain control of its territories in Mexico and to ease the transport of its drug shipments, the DTO bribed local law enforcement officials and engaged gunmen to kill members of rival cartels.

Leyva's primary role in the organization was to control the receipt, transportation, and sale of cocaine through Culiacán, Sinaloa in Mexico, its hub for cocaine operations. He was also responsible for overseeing the production of methamphetamine in laboratories around the Culiacán area.

## B. Procedural History

The Mexican Army arrested Leyva in January 2008. He has been in continuous custody since then, though he was not extradited to the United States until November 2014. In August 2012 a grand jury in the District of Columbia returned a one-count indictment charging him with conspiracy to distribute 5 kilograms or more of cocaine, 50 grams or more of methamphetamine, 1 kilogram or more of heroin, and 1,000 kilograms or more of marijuana for importation into the United States in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(1)(G), 960(b)(1)(H), and 963. The indictment covered the period from January 2000 through the date it was filed. The district court later granted the Government's motion to dismiss the charges involving heroin and marijuana, leaving only the cocaine and methamphetamine charges.

In February 2016, shortly before trial was to begin, Leyva pleaded guilty. He did so without a plea agreement. At the plea hearing, the district court engaged the defendant in a lengthy colloquy before accepting his plea. The judge asked the defendant whether he had reviewed and discussed the indictment with his attorneys. Leyva confirmed he had; one of

his attorneys further confirmed he had gone over the document with Leyva in Spanish and that Leyva had received a Spanish-language translation of the indictment at the time of his extradition. The district court also asked the defendant if he was satisfied with his attorneys' representation. Leyva said that he was.

The judge did not verify that Leyva understood his right to be represented by counsel and to have the court appoint counsel if need be. Nor did he mention the possibility of forfeiture or that, in determining a sentence, the court would apply the Sentencing Guidelines and the factors under 18 U.S.C. § 3553(a). Leyva's counsel did not object to any of these omissions.

The court then asked the Government to summarize the evidence it would have brought at trial. Following that presentation, the judge asked the defendant whether he was guilty of the Government's various allegations; he said he was. Specifically, Leyva admitted that he "was a member of the Beltran Leyva organization" and that the organization "finance[d] shipments" of cocaine "from Colombia to Mexico for transshipment to the United States." He further admitted that the organization "produced methamphetamine in Mexico for distribution, ultimately, in the United States." When asked if he was "one of the leaders of the Beltran Leyva organization," however, the defendant denied it. He insisted that he "would just help [his] brother, Artur[o]."

At the end of the hearing, the district court judge determined that Leyva's plea was "knowing, voluntary, and supported by an independent basis in fact as to each of the essential elements of the offense." He therefore accepted the plea.

The court scheduled Leyva's sentencing for October 2016. In due course, the Probation Office (PO) prepared a presentence report (PSR) for Leyva describing his role in the conspiracy. The PO calculated a base offense level of 38, based upon the quantity of drugs involved. It then applied a four-level enhancement because Leyva was an organizer or leader of criminal activity under USSG § 3B1.1(a), and two-level enhancements each for possession of a dangerous weapon, under USSG § 2D1.1(b)(1); use of violence, under USSG § 2D1.1(b)(2); bribing a law enforcement official, under USSG § 2D1.1(b)(11); and being a leader or organizer directly involved in the importation of a controlled substance, under USSG § 2D1.1(b)(15)(C) (2015). In addition, the PO recommended a three-level reduction for acceptance of responsibility under USSG § 3E1.1(a) and (b). The PO also concluded Leyva had a criminal history score of zero, resulting in a criminal history category I.

A few days before the sentencing hearing, the parties attempted to stipulate to the applicable adjustments under the Guidelines. They agreed to a total base offense level of 42, which yields a sentencing range of 360 months to life. The district court refused to accept the stipulation, however. It decided to hear evidence and make its own determination as to the appropriate sentencing range.

In February 2017, prior to his rescheduled sentencing, Leyva filed a motion to withdraw his guilty plea. He argued that his plea was "not knowing or voluntary" because the trial court "did not fully follow the procedures that [Federal Rule of Criminal Procedure 11] states must be followed" during the plea colloquy. He further asserted that "[b]ut for the Court's failure to follow the mandate of Rule 11, [he] would not have pled guilty." The district court denied the motion on the grounds that it had substantially complied with Rule 11 and that

Leyva had "admitted facts under oath in several contexts which make his claim of innocence utterly improbable." The district court therefore proceeded with sentencing.

Leyva did not dispute his base offense level, but he objected to the enhancements recommended by the PO. Although the Government had initially concurred with the recommendations in the PSR, it decided to oppose the adjustment for acceptance of responsibility because Leyva had attempted to withdraw his guilty plea.

The district court conducted an evidentiary hearing lasting three days. The Government presented the testimony of Tom Hatherley and Paul Peschka, case agents from the Department of Homeland Security and the Federal Bureau of Investigation, respectively. They testified about the statements of three witnesses to the defendant's activities, whom they had interviewed: (1) Jesus Zambada Garcia, a member of the Sinaloa Cartel; (2) Sergio Villarreal Barragan, a member of the DTO responsible for security; (3) Harold Mauricio Poveda Ortega, who served as a broker between Colombian cocaine suppliers and the DTO.

Based upon the evidence introduced at the hearing, the district court applied all the five enhancements recommended in the PSR.[1] The court also held the defendant did not qualify for a downward adjustment for acceptance of responsibility. Defendant's final offense level was therefore 50 — which is treated as the maximum 43 under USSG ch. 5, pt. A, cmt. n.2

---

[1] The PO had based the PSR on the 2015 Guidelines, but by the time Leyva was sentenced, in April 2017, the 2016 Guidelines were in effect. For the purposes of this case, there is no material difference between the 2015 and 2016 versions.

— producing a Guidelines "range" of life imprisonment. After considering the factors in 18 U.S.C. § 3553, the court found "no basis to depart down" and imposed a life sentence. In addition, the court determined "the defendant obtained proceeds of at least $529.2 million" as a result of his involvement in the conspiracy and ordered forfeiture in that amount. Leyva now appeals the denial of his motion to withdraw his guilty plea, his sentence, and the forfeiture.

## II. Motion to Withdraw Guilty Plea

Leyva argues that the district court erred in refusing to permit him to withdraw his guilty plea. Generally, "[w]ithdrawal of a guilty plea before sentencing is liberally granted." *United States v. Ford*, 993 F.2d 249, 251 (D.C. Cir. 1993). On appeal, however, this court "reviews a district court's refusal to permit withdrawal only for abuse of discretion." *United States v. Curry*, 494 F.3d 1124, 1128 (D.C. Cir. 2007) (citations omitted) (cleaned up).

In determining whether the district court abused its discretion, this court considers three factors: (1) "whether the defendant has asserted a viable claim of innocence," (2) "whether the delay between the guilty plea and the motion to withdraw has substantially prejudiced the Government's ability to prosecute the case," and (3) "whether the guilty plea was somehow tainted" by a violation of Rule 11. *Ford*, 993 F.2d at 251 (cleaned up). We clarified in *United States v. Cray* that the third factor is all but dispositive. 47 F.3d 1203, 1207 (D.C. Cir. 1995) ("[N]one of our cases would have been decided differently if the only inquiry undertaken were whether the defendant's guilty plea was taken in compliance with Rule 11"). If the district court did not conduct the plea colloquy in "substantial compliance" with Rule 11, then the defendant should "almost always" be permitted to withdraw his plea.

*Ford*, 993 F.2d at 251. At the same time, "a defendant who fails to show some error under Rule 11 has to shoulder an extremely heavy burden if he is ultimately to prevail." *Cray*, 47 F.3d at 1208.

The Government does not argue that the withdrawal of Leyva's plea would have prejudiced it at trial. Accordingly, our review focuses upon the first and third factors.

## A. Compliance with Rule 11

With regard to the third and most important factor, Leyva contends the district court violated Rule 11 because it failed to inform him (a) of his right to counsel, including his right to appointed counsel, if necessary (Rule 11(b)(1)(D)); (b) that in determining a sentence, the court must consider the applicable Sentencing Guidelines range and the factors in 18 U.S.C. § 3553(a) (Rule 11(b)(1)(M)); and (c) that he would be subject to "any applicable forfeiture" (Rule 11(b)(1)(J)).

Rule 11(b)(1) requires the district court to "inform the defendant of, and ensure the defendant understands" all the information listed in that subsection. Rule 11(h), however, excuses a variance from the requirements of the rule if the error is harmless. The Congress added this provision in order to "end the practice … of reversing automatically for any Rule 11 error." *United States v. Vonn*, 535 U.S. 55, 66 (2002). Accordingly, this court has made clear "we will not reverse a trial court in its application of Rule 11 except when it has failed to address the Rule's core inquiries." *Ford*, 993 F.2d at 254. We have also held a district court's variance from the requirements of Rule 11 is harmless if "the record reveals either that the defendant had actual notice of the information that the district judge failed to convey or that the information would not

have been important to the defendant." *United States v. Dewalt*, 92 F.3d 1209, 1213–14 (D.C. Cir. 1996).

We hold that Leyva's plea proceeding substantially complied with the requirements of Rule 11 and that any deviations were harmless. First, as to his right to counsel, Leyva had actual knowledge of the relevant information. He was already represented by counsel at the time of the plea hearing; the district court confirmed he was satisfied with that representation. For the same reason, information about his right to appointed counsel would not have been important to Leyva.

Second, we hold the district court communicated the essential information required by Rule 11(b)(1)(M): "in determining a sentence, the court's obligation to calculate the applicable sentencing-guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a)." Although the court did not explicitly reference the Guidelines, it did inform Leyva of the statutory maximum and mandatory minimum sentences, and that the court would not be able to determine his exact sentence "until after a presentence report has been completed." The district court also explicitly instructed the defense attorneys — during the plea hearing, in Leyva's presence — to focus on the § 3553 factors in their sentencing memoranda.

These statements addressed the "core considerations," *Ford*, 993 F.2d at 253, of Rule 11(b), as identified by this court in *United States v. Horne*, 987 F.2d 833 (D.C. Cir. 1993). There we said the trial court "uses the Rule 11 colloquy to dispel any misconceptions that the defendant may have about his likely sentence and to ensure that his plea is 'not the result … of promises apart from a plea agreement.'" *Id.* at 838

(quoting what is now Fed. R. Crim. P. 11(b)(2)) (alteration in original).  It is "neither unfair nor unjust," therefore, to hold the defendant to his plea when, as here, "he was warned by the court of his maximum exposure and of the impossibility of determining the applicable sentencing range prior to the preparation of the presentence report."  *Id.* at 837.

Finally, Leyva had already been informed of the possibility of forfeiture through the indictment, which the district court confirmed he had read, reviewed with counsel — including in Spanish — and understood.  Our decision in *Ford* is not to the contrary.  In that case we held the district court had failed to ensure the defendant understood "the nature of the charge to which the plea is offered," as required by Rule 11, even though the court had asked whether the defendant "had seen, read, discussed with his attorney, and understood the indictment."  993 F.2d at 253 (applying an earlier version of what is now Rule 11(b)(1)(G)).  In other words, that a defendant has read the indictment does not establish that he understood "the nature of the charge." Effective notice of the nature of the charge means "notice sufficient to give the defendant 'an understanding of the law in relation to the facts' of his case," so he can assess the Government's ability to prove his conduct falls within the charge.  *Dewalt*, 92 F.3d at 1211 (quoting *McCarthy v. United States*, 394 U.S. 459, 466 (1969)).  So defined, the nature of the charge may not be apparent on the face of the indictment.  In *Dewalt*, for instance, we held the district court should have explained the mens rea element of the charge, *viz.*, that the defendant "knowingly received and possessed a firearm."  92 F.3d at 1214.

In contrast, the defendant's objection in the present case concerns the district court's obligation to inform him, pursuant to Rule 11(b)(1)(J), that he will be subject to "any applicable forfeiture."  Before the court determines the amount of the

forfeiture, there is nothing to be said except that the defendant may be subject to a forfeiture, and the indictment did just that. Indeed, the terms of the indictment were "crystal clear," *United States v. Lee*, 888 F.3d 503, 508 (D.C. Cir. 2018):

> The United States hereby gives notice to the defendant that upon conviction of the Title 21 offense alleged in Count One of this Indictment, the government will seek forfeiture in accordance with Title 21, United States Code, Sections 853 and 970, of all property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of the alleged Title 21 violation, and all property used or intended to be used in any manner or part to commit and to facilitate the commission of such offense.

For these reasons, we conclude Leyva had actual notice of the possibility of forfeiture.

Although we find the district court's plea colloquy with Leyva was in substantial compliance with Rule 11, we do not approve of the district court's omissions. Our ruling today "should not be read as an invitation to trial judges to take a more casual approach to Rule 11 proceedings." *Lee*, 888 F.3d at 509 (quoting Fed. R. Crim. P. 11(h), Advisory Committee Notes to 1983 Amendments). To the contrary, we emphasize that it is best practice diligently to communicate all the information listed in Rule 11(b)(1).

## B.  Viable Claim of Innocence

That the defendant did not assert a viable claim of innocence lends further support to the district court's decision not to allow him to withdraw his guilty plea. Our cases have not always been precise in describing this factor. We have sometimes "characterized [it] as requiring a 'legally cognizable

defense' rather than as requiring a viable claim of innocence." *Curry*, 494 F.3d at 1129.

The distinction makes no difference in this case, however. Leyva has admitted "the essential elements of the charge: that he was part of the conspiracy to distribute controlled substances." He makes no claim of innocence, let alone a viable one.

The only "defense" Leyva did assert before the district court was that "as a legal matter he believed that the Court lacked jurisdiction over him" because, according to Leyva, Mexico authorized his extradition solely with respect to conduct that occurred after January 2008. But even our cases calling only for a "legally cognizable defense" have required that the defendant have "effectively denied his culpability," *United States v. Barker*, 514 F.2d 208, 220 (D.C. Cir. 1975), which Leyva has not done. In any event, Leyva had raised this objection, and the district court had rejected it, before Leyva entered his plea of guilty. Consequently, he had nothing to gain in this regard by withdrawing his plea and proceeding to trial. The district court therefore did not abuse its discretion in denying the defendant's motion to withdraw his guilty plea. *See Curry*, 494 F.3d at 1129 (finding no abuse of discretion where the defendant's defense "had a very limited chance of success").

## III. Sentencing Issues

Leyva challenges two aspects of his sentence. First, he objects to the 12 points in sentencing enhancements the district court applied. Second, he contends that the district court erred in denying him a three-point adjustment for acceptance of responsibility.

Leyva asserts various errors with respect to each enhancement; the one argument common to all five is that the evidence establishing the relevant conduct was unreliable. "It is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted." *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) (cleaned up). In resolving a factual dispute related to sentencing, the Guidelines permit a district court to "consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). Accordingly, Leyva's argument is that the evidence relied upon by the district court lacked "sufficient indicia of reliability."

An appellate court generally "reviews the factual findings supporting a sentence under the Sentencing Guidelines for clear error." *United States v. Stover*, 329 F.3d 859, 871 (D.C. Cir. 2003). This court has not specified the standard of review, however, for a district court's determination that evidence is "reliable" under USSG § 6A1.3(a). *See In re Sealed Case*, 246 F.3d 696, 700 (D.C. Cir. 2001) (deeming the evidence reliable under de novo review without deciding the applicable standard).

Leyva argues the reliability of evidence is a "legal issue reviewable de novo." We disagree. Far from being a pure issue of law, a district court's determination of reliability during a sentencing hearing is akin to an evidentiary ruling at trial, which we review for abuse of discretion, *see United States v. Mathis*, 216 F.3d 18, 27-28 (D.C. Cir. 2000); *see also In re Sealed Case*, 350 F.3d 113, 124 (D.C. Cir. 2003) (reviewing evidentiary rulings at sentencing for abuse of discretion). A district court's decision to rely upon hearsay is necessarily a judgment about the credibility of both the witness and the

declarant. *See, e.g.*, *United States v. Agyemang,* 876 F.2d 1264, 1272 (7th Cir. 1989) (finding no abuse of discretion in relying upon hearsay evidence of an identification where the defendant cross-examined the witness and was able to point out weaknesses in the declarant's identification). We give "especially strong deference to credibility determinations because the district court has a unique opportunity to evaluate the credibility of witnesses and to weigh the evidence." *United States v. Jones*, 744 F.3d 1362, 1367 (D.C. Cir. 2014). We therefore join the majority of our sister circuits in holding that abuse of discretion is the appropriate standard for reviewing a district court's evaluation of the reliability of hearsay evidence at sentencing. *See United States v. Rodriguez*, 731 F.3d 20, 31 (1st Cir. 2013); *United States v. Pineda*, 770 F.3d 313, 318 (4th Cir. 2014); *United States v. Moncivais*, 492 F.3d 652, 658 (6th Cir. 2007); *United States v. Tapias*, 610 F.3d 505, 514 (7th Cir. 2010); *United States v. Sheridan*, 859 F.3d 579, 583 (8th Cir. 2017); *United States v. Hernandez-Guerrero*, 633 F.3d 933, 935 (9th Cir. 2011); *United States v. Kendrick*, 697 F. App'x 622, 623 (11th Cir. 2017) (unpublished); *see also United States v. Ryan*, 806 F.3d 691, 693 (2d Cir. 2015) (applying the clear error standard); *United States v. Jones*, 514 Fed. App'x 229, 232 (3d Cir. 2013) (unpublished) (same); *United States v. Ortega-Calderon*, 814 F.3d 757, 760 (5th Cir. 2016) (same); *United States v. Martinez*, 824 F.3d 1256, 1261 (10th Cir. 2016) (same).

## A. Leadership Enhancement under § 3B1.1(a)

In order to apply the four-level enhancement for being an organizer or leader of criminal activity under USSG § 3B1.1(a), the district court must find it was "more likely than not that the defendant led, managed, or supervised the crime." *Bapack*, 129 F.3d at 1324. The district court identified two pieces of evidence supporting its conclusion that Leyva was a

leader of the cartel.  First, "[a]ll three cooperating witnesses … reported that the defendant was the top authority in charge of controlling various geographic areas in Mexico that were critical to the Beltran Leyva drug trafficking organization."  As the district court highlighted, Poveda and Villarreal provided details about the defendant's control of one such area, Culiacán.  According to them, the importance of Culiacán as a hub for the DTO meant that Leyva was the principal person in "control of the [DTO's] trafficking of narcotics into the United States."  Second, Poveda and Villarreal reported the defendant met with the leaders of the Sinaloa Cartel in order to coordinate joint ventures, indicating his authority to speak on behalf of the DTO.

Leyva argues this evidence is unreliable for two reasons.  First, the statements of Poveda and Villarreal are hearsay, relayed to the court by case agents Hatherly and Peschka; the cooperators themselves did not testify.  The Sentencing Guidelines, however, expressly permit consideration of "reliable hearsay."  USSG § 6A1.3 cmt.  Even "out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means."  *Id.*  The question before us, then, is whether there was sufficient corroboration to make the hearsay reliable.

Here, the district court took care to rely only upon facts substantiated by more than one cooperator.  *See Jones*, 744 F.3d at 1367 (affirming the defendants' sentences where the district court "relied only on testimony corroborated by at least one … other witness[]").  Further, the court explained, "Poveda had personal knowledge of the ultimate authority that the defendant exercised over critical pieces of the drug trade because he was in charge of supplying drugs to the organization."  Zambada confirmed that "Poveda was a main

supplier of cocaine to the Beltran Leyva Organization." The court also determined "Villarreal had personal knowledge of the defendant's position because his job was to work with defendant's security employees to secure the defendant." On this record, the district court did not abuse its discretion in holding the hearsay evidence reliable.

Leyva also levies a barrage against the character and incentives of Poveda and Villarreal, and, for that matter, Zambada: They may have been hoping to curry favor with the Government; Zambada may have believed Leyva had "something to do with the murder of his son"; Poveda was a "drug kingpin" with a violent criminal history; Zambada and Villarreal were drug addicts; Villarreal was "a corrupt policeman" and "a sadistic multiple murderer." He reiterates these objections with respect to each of the enhancements; we reject them here, once and for all.

At the outset, we observe that Leyva's attorneys cross-examined the FBI agents at length about the co-conspirators' cooperation agreements and bad acts. The district court was therefore "well aware of the cooperators' credibility issues." *Jones*, 744 F.3d at 1367. More important, Leyva's attacks are too general. As we said in *Jones*, "while such facts may undercut the cooperators' credibility generally, they do not establish that it was implausible for the district court to credit particular aspects of their testimony, especially where, as here, the cooperators offered mutually corroborative accounts." *Id*.; *accord United States v. Bell*, 795 F.3d 88, 106 (D.C. Cir. 2015). After all, "the testimony of co-conspirators … is often credited if other indicia of reliability are present," *In re Sealed Case*, 246 F.3d 696, 701 (D.C. Cir. 2001).

In short, because the reports were mutually corroborative and the district court took due care in weighing the evidence,

we conclude the court did not abuse its discretion in crediting the cooperators' statements.

## B. Weapons Enhancement under § 2D1.1(b)(1)

In order to justify imposing a two-level enhancement for possession of a "dangerous weapon," the Government must show that the "weapon (including a firearm) was possessed" in connection with a drug offense. USSG § 2D1.1(b)(1); *see also Mathis*, 216 F.3d at 27. Here, the weapon in question is a pistol inscribed with "El Aguila" — Spanish for "the Eagle" — that the defendant carried "as he conducted drug trafficking business." In finding that Leyva possessed the pistol, the district court cited the Mexican evidence report on Leyva's arrest, which indicated that he was captured with the pistol. Additionally, the court credited Zambada's and Villarreal's reports of having witnessed the defendant in possession of a pistol.

As with the leadership enhancement, the district court did not abuse its discretion in relying upon this hearsay evidence. Zambada's and Villarreal's statements were corroborated not only by one another, but also by the Mexican evidence report.

Leyva responds that the district court should not have considered the Mexican report because police reports generally do not fall within Federal Rule of Evidence 803(8) — the public records exception to the hearsay rule — in criminal cases. *See* Fed. R. Evid. 803(8)(A)(ii) (excluding "a matter observed by law-enforcement personnel"); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321-22 (2009). As he acknowledges, however, the Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. 1101(d)(3). To the extent he argues the exclusion of police reports from Rule 803(8) casts doubt upon the reliability of police reports as such, *see* Fed. R.

Evid. 803, Advisory Committee Notes to 1974 Enactment ("Ostensibly, the reason for this exclusion is that observations by police officers … are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases."), his objection has little force here: The Government relied upon the report only for its photographs of the items seized at the time of the defendant's arrest, and not for any other aspect of the Mexican investigation. Under these circumstances, the district court was well within its discretion to admit those portions of the report for the "limited purpose" of corroborating the cooperators' accounts. *See* Joint Appendix (J.A.) 375. We therefore hold the district court did not abuse its discretion in considering the evidence from Zambada and Villarreal or clearly err in finding the gun belonged to the defendant.

Leyva also challenges the weapons enhancement by claiming this particular pistol was an inoperable collector's item, but that is of no moment: Since 2000, the Sentencing Commission has defined "dangerous weapon" to include "an object that is not an instrument capable of inflicting death or serious bodily injury but … closely resembles such an instrument." USSG § 1B1.1 cmt. n.1(D); *see also United States v. Burke*, 888 F.2d 862, 869 (D.C. Cir. 1989) (concluding the term "firearm" under USSG 2D1.1(b) includes inoperable as well as operable firearms). A collector's model of a pistol certainly comes within this definition. Leyva does not suggest the item at issue differed in appearance from an operable firearm. Accordingly, we hold a firearm is a "dangerous weapon" within the meaning of § 2D1.1 regardless whether it is capable of being fired.

## C. Adjustment for Acceptance of Responsibility under § 3E1.1(a)

With respect to the sentencing enhancements for the use of violence, for bribery, and for being a leader directly involved in the importation of a controlled substance, Leyva again argues the evidence was insufficiently reliable and contends, for the first time on appeal, that the application of those enhancements violates the Ex Post Facto Clause of the U.S. Constitution because the enhancements were added to the Sentencing Guidelines after he engaged in the relevant conduct.

In order to "avoid the unnecessary resolution of constitutional questions," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009), we turn first to Leyva's claim that the district court should have granted him an adjustment for acceptance of responsibility under USSG § 3E1.1(a). Having already upheld six points in enhancements, if we deny Leyva the adjustment for acceptance of responsibility — as we do — then Leyva will have a final offense level of at least 44. Because any offense level above 43 is treated as 43, the maximum, any error with respect to the other three enhancements would not affect his sentence, *see* USSG ch. 5, pt. A, cmt. n.2l, and we would have no occasion to reach his Ex Post Facto argument.

The district court's conclusion that a defendant has not "clearly demonstrated acceptance of responsibility" within the meaning of USSG § 3E1.1(a) is an application of the Guidelines to the facts, which this court reviews under a due deference standard. *United States v. Rodriguez*, 676 F.3d 183, 192 (D.C. Cir. 2012). Due deference review lies "somewhere between de novo and 'clearly erroneous'" review. *United States v. Cano-Flores*, 796 F.3d 83, 90 (D.C. Cir. 2015).

It is the defendant's burden to convince the district court that he is entitled to the downward adjustment for acceptance of responsibility. *United States v. McLean*, 951 F.2d 1300, 1302 (D.C. Cir. 1991). Even a "defendant who enters a guilty plea is not entitled to an adjustment … as a matter of right." *United States v. Saani*, 650 F.3d 761, 767 (D.C. Cir. 2011) (quoting USSG § 3E1.1 cmt. n.3).

The transcript of the sentencing hearing indicates the district court denied the downward adjustment because the defendant falsely minimized his role in the conspiracy. The court explained, "I think he has sought to avoid responsibility, to the extent that he could, and minimize his involvement and role here."

Our case law is clear: It is not error for a district court to "require an acceptance of responsibility that extended beyond the narrow elements of the offense" to "all of the circumstances" surrounding the defendant's offense. *United States v. Taylor*, 937 F.2d 676, 680–81 (D.C. Cir. 1991). The Application Notes to § 3E1.1 provide, "A defendant who falsely denies … relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility …." USSG § 3E1.1 cmt. n.1(A). Relevant conduct includes the defendant's leadership role. *See, e.g.*, *United States v. Shipley*, 963 F.2d 56, 59 (5th Cir. 1992) ("[A] defendant who is found to have had a leadership role in the offense does not fully accept responsibility for purposes of § 3E1.1 if, despite his admission of all elements of the offense of conviction, he nevertheless attempts to minimize his leadership role").

Having upheld the district court's finding that Leyva was "one of the leaders" of the DTO, we cannot say it was

unreasonable for the district court to conclude Leyva failed to accept responsibility when he falsely denied being a leader. Leyva would confess and avoid on the ground that he "merely sought to require the Government to justify enhancements through reliable information." Leyva's motivation for denying his leadership role is immaterial, however; he cannot accept responsibility for his conduct and simultaneously contest the sufficiency of the evidence that he engaged in that conduct.

## D. Enhancements under §§ 2D1.1(b)(2), (11), (15)(C)

Because we affirm the district court's denial of the adjustment for acceptance of responsibility, as well as its application of six points in enhancements, Leyva has a final offense level of at least 44. Therefore, as explained in Part III.C above, we do not need to reach his arguments against the enhancements for using violence, bribing a law enforcement official, and being a leader directly involved in the importation of a controlled substance. We pause to note only that applying these enhancements would present a serious Ex Post Facto question if we had occasion to reach the merits and if the objection had been properly preserved.

## IV. Forfeiture Issues

Leyva's final challenges are to the forfeiture element of his sentence. Pursuant to 21 U.S.C. § 853(a)(1), "Any person convicted of [certain crimes] punishable by imprisonment for more than one year shall forfeit to the United States … any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." Section 970 makes this provision applicable to the controlled substances crimes of which Leyva was convicted.

The district judge ordered Leyva to forfeit $529.2 million. To arrive at that figure, the court estimated that Leyva's organization transported 25,200 kilograms of cocaine from Culiacán to the border during a single three-month period. The court then multiplied that amount by $21,000 per kilogram, the price of cocaine on the Mexican side of the border according to the Drug Enforcement Administration (DEA).

A district court uses a preponderance of the evidence standard in determining the appropriate amount of a forfeiture. *See, e.g.*, *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). "In an appeal from a criminal forfeiture proceeding," as usual, "we review the district court's fact finding for clear error and the district court's legal interpretations de novo." *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015) (citations omitted).

Leyva does not take issue with the price per kilogram used by the district court. He likewise concedes that "proceeds" in § 853 means gross receipts, not net profits. He objects only to the amount of cocaine attributed to him.

First, Leyva argues the district court's calculation of the quantity of cocaine was based upon unreliable evidence. The court principally relied upon evidence from Villarreal, who conducted a security evaluation of Leyva's outfit in Culiacán for three to six months in 2005. Villarreal reported seeing planes being loaded with cocaine in Culiacán to be flown to the U.S. border. We review for abuse of discretion the district court's decision to credit Villarreal's evidence in determining the amount to be forfeited. *Cf. Libretti v. United States,* 516 U.S. 29, 39 (1995) (holding criminal forfeiture is an aspect of sentencing).

We see no abuse of discretion in this case. Leyva reiterates his attacks on Villarreal's hearsay evidence and poor character, rejected above. Leyva also likens his case to *United States v. Nava*, 404 F.3d 1119 (9th Cir. 2005), which is wholly inapposite. Unlike the district court in *Nava,* the court here did not rely upon conflicting or ambiguous reports. The court found Villarreal's hearsay evidence to be credible because he was "actually present and witnessed defendant oversee and direct the air shipments of cocaine." In addition, the Government presented evidence from Poveda that Leyva purchased several hundred thousand kilograms of Colombian cocaine from 2004 to 2008. The court treated Poveda's account of Leyva's cocaine supply as corroboration for Villarreal's testimony.

Second, Leyva argues the amount of the forfeiture exceeds the "outer bounds of reasonableness" because it is "based on unreliable assumptions and unsound reasoning." We realize that extrapolation can create a significant risk of error, depending upon the predicate values used. *See, e.g.*, *United States v. Candelaria-Silva*, 714 F.3d 651, 658 (1st Cir. 2013) ("[W]here, as here, a drug quantity determination relies on multiples of averages or extrapolations, the sentencing court must be mindful of the potential for error where one conclusory estimate serves as the multiplier for another"). A district court should therefore err on the side of caution, using only reliable or conservative estimates.

To that end, the district court used low-end estimates of what Villarreal said were (1) the number of planes departing at a time; (2) the number of trips the planes made per week; (3) the amount of cocaine per plane; and (4) the amount of time Villarreal spent with the defendant. Thus, although Villarreal said he saw "caravans of seven to ten planes," the court used seven. Villarreal said the caravans left "one or two times a

week"; the court used one. Villarreal said there were "approximately 300 to 350 kilograms of cocaine per plane"; the court used 300 kilograms. Villarreal said he was in Culiacán with the defendant for "approximately three to six months"; the court used 12 weeks. Moreover, the court's calculation covered only the period that Villarreal actually witnessed, not the full duration of the conspiracy.

In sum, the $529.2 million forfeiture was a conservative estimate of the revenue obtained by the operation in Culiacán that Leyva personally oversaw. On this record, we find no clear error in the court's calculation of the proceeds of Leyva's criminal activities.

Last, Leyva argues the Government failed to show that the entire $529.2 million allegedly earned by the drug organization was personally acquired by the defendant, as required by *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), and *Cano-Flores*, 796 F.3d 83. Because the defendant is raising this objection for the first time on appeal, we review the record for plain error. *United States v. Wheeler*, 753 F.3d 200, 210 (D.C. Cir. 2014). This means Leyva can prevail only if the district court committed "(1) an error, (2) that [was] clear or obvious, (3) that affected the outcome of the district court proceedings, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Grey*, 891 F.3d 1054, 1058 (D.C. Cir. 2018).

The district court expressly recognized its obligations under *Cano-Flores*. The case law, however, was (and is) far from clear that property acquired by an organization cannot qualify as property "obtained, directly or indirectly" by a leader of that organization. In *Cano-Flores*, we held the district court erred in attributing to the defendant $15 billion in proceeds earned by the entire cartel of which the defendant was a mid-

level member; the district court had done so on the theory that those proceeds were "reasonably foreseeable" by him. 796 F.3d at 91. We also stated, however, that property obtained "indirectly" might include "property received by persons or entities that are under the defendant's control," such as "an employee or other subordinate of the defendant." *Id.* at 92. Leyva, unlike Cano-Flores, was a leader of his organization, and the district court attributed to him only proceeds from activities directly supervised by Leyva in Culiacán. As a result, this case comes within the exception that we described in *Cano-Flores*.

*Honeycutt*, like *Cano-Flores*, did not involve the leader of an organization, and hence did not close this potential exception. There the manager of a hardware store was found guilty of conspiring with the owner of the store to sell iodine with the knowledge it would be used to manufacture methamphetamine. 137 S. Ct. at 1630. The Supreme Court held the defendant could not be held liable for forfeiture of the proceeds because he was merely a salaried employee who "did not personally benefit" from the sales. *Id.* at 1631, 1635.

Finally, we note that even now Leyva does not specify what amount should have been excluded from the court's calculation of his gross receipts. For both reasons, we could not deem any error by the district court "clear or obvious."

## V. Conclusion

The district court, which substantially complied with the requirements of Rule 11, did not abuse its discretion in denying Leyva's motion to withdraw his guilty plea. The appellant's various objections to his sentence and the forfeiture imposed by the court are unavailing for the reasons given above.

The judgment of the district court is, therefore,

*Affirmed.*