# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-11731

United States Court of Appeals
Fifth Circuit

**FILED**

July 3, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

JESUS GERARDO LEDEZMA-CEPEDA,
  Also Known as Chuy, Also Known as Juan Ramos;
JOSE LUIS CEPEDA-CORTES,

Defendants–Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before SMITH, WIENER, and WILLETT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Jesus Ledezma-Cepeda ("Ledezma") and Jose Cepeda-Cortes ("Cepeda") appeal their convictions of interstate stalking and conspiracy to commit murder for hire. Cepeda appeals his conviction of tampering with documents or proceedings. Cepeda claims the district court abused its discretion in declining

No. 16-11731

to sever his case for trial, and Ledezma objects to evidentiary rulings. Discerning no error, we affirm.

I.

Ledezma was a member of Grupo Rudo, a collection of drug-cartel members and corrupt police officers in San Pedro Garza Garcia, Nuevo Leon, Mexico. Though not a cartel member, Ledezma was friends with multiple members of the Beltran-Leyva Organization, a drug cartel led by Hector Beltran-Leyva. Ledezma also held a day job as a private investigator focusing primarily on tracking cheating spouses and people suspected of theft. His son, Jesus Ledezma-Campano ("Campano"), occasionally helped him with those jobs.

Beltran-Leyva cartel leader Rodolfo Villareal-Hernandez ("Gato") asked Ledezma to track down Juan Guerrero-Chapa, who Gato believed was responsible for his father's death. The search took Ledezma to the United States, where he recruited his cousin Cepeda to assist.[1] The two eventually traveled to Florida, where, together with a few others, they trailed Chapa's brother, Armando. Cepeda rented a house for the group close to Armando's gated community; the crew monitored his vehicles with GPS trackers, and they conducted in-person surveillance around Armando's house for a few months.

When the Florida search proved fruitless, Ledezma and Cepeda flew back to Texas, where Cepeda discovered a Grapevine, Texas, property-tax record for Chapa's sister-in-law, Laura Martinez. After reporting back to the cartel leader, the crew headed to Grapevine and placed a tracker on Martinez's car. Cepeda then rented an apartment close to Martinez's house, where Ledezma and Campano lived and where Cepeda occasionally joined them.

---

[1] Cepeda had helped Ledezma with a job once before, tracking an allegedly unfaithful spouse to New York City.

No. 16-11731

Tracking Martinez proved useful—she led the trio to Chapa. Once Cepeda confirmed Chapa's address via a property-record search, Campano put surveillance cameras in front of the house and around the neighborhood. Ledezma and Campano also placed GPS trackers on Chapa's vehicles. Cepeda provided Ledezma and Campano with car decals to disguise their vehicles and deflect attention. The group then monitored Chapa's comings and goings, and Ledezma sent Gato regular reports and pictures of Chapa and his family.

After a few weeks, Gato sent two hitmen to Texas. Ledezma and Campano met them at a hotel outside Fort Worth to give them a GPS tracking device. Cepeda returned home to the Rio Grande Valley, and Ledezma and Campano remained in Grapevine.

The day of the murder, Cepeda was in his hometown of Edinburgh, Texas, preparing for a trip to California with his girlfriend. Ledezma and Campano were in the Grapevine area keeping close tabs on Chapa at Gato's direction. In the evening they followed Chapa and his wife to the upscale Southlake Town Square shopping center, where they parked and continued to keep watch. After about an hour, a white SUV stopped near Chapa's vehicle. A passenger with a hoodie obscuring his face got out, walked to the passenger side of Chapa's vehicle, and fired six shots, killing Chapa.

Gato directed Ledezma and Campano to destroy their cell phones and any other evidence. The two men did so, then moved out of their Grapevine apartment and returned to the Rio Grande Valley. About two weeks later, someone used Cepeda's business computers to search "obstruction of justice," how to wipe a computer hard drive, and Blackline GPS privacy policies. Over the next year, someone wiped the computers' hard drives multiple times. Cepeda also wiped his cell phone history.

Later that year, Cepeda visited Ledezma in Mexico. While there, Cepeda

3

requested more money for his part in the investigation. Ledezma, Campano, and Cepeda also discussed a potential alibi by which they would place the blame on Ledezma and say that Campano and Cepeda had merely been helping him because of his poor health and inability to speak English.

More than a year after Chapa's murder, agents arrested Ledezma and Campano as they entered the United States; Cepeda was arrested shortly thereafter. A grand jury indicted all three for interstate stalking and aiding and abetting interstate stalking in violation of 18 U.S.C. § 2261A and conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958. Cepeda was also indicted for tampering with documents or proceedings in violation of 18 U.S.C. § 1512(c)(1). Campano negotiated a plea agreement, pleading guilty of interstate stalking and agreeing to testify against Ledezma and Cepeda at trial.

The government filed a notice of intent to use Federal Rule of Evidence 404(b) evidence linking Ledezma to at least nine additional murders over five years and showing that he had been actively tracking two other persons at the time of his arrest. In response, Cepeda filed his first motion for severance, arguing that the spillover effect from evidence of multiple drug cartel murders would unduly prejudice him and deny him the right to have the jury weigh only the evidence against him. The district court denied Cepeda's motion. But at a pre-trial conference, the court granted Cepeda's request for a motion in limine requiring the government to approach the bench before introducing evidence of Ledezma's extraneous offenses.

At trial, Ledezma raised a duress defense. He admitted to every fact the government had proven but claimed he had to follow Gato's instructions to avoid death or serious harm to himself and his family. Cepeda also admitted to the majority of the evidence against him but contended that he lacked the

mental state for stalking and murder for hire. Cepeda claimed that he believed Chapa was a white-collar criminal who had stolen money from Mexican banks and that the investigation was legitimate.

The trial lasted about two weeks, and on about half of those days, the government introduced evidence that Ledezma had tracked other people who were murdered by the cartel. Ledezma's son, Campano, testified that he attended a cartel meeting and saw men with automatic weapons and a chainsaw with blood on it. He also testified that Gato was angry at Chapa's sister because she had sent him videos of his family members' being killed, including one of his female family members who had been decapitated.

The government spent much time on the murder of one Eliseo Elizondo, whom Ledezma tracked for the cartel. The government called four witnesses to attest to the murder, including Elizondo's brother and his former bodyguard, and a case agent and DEA agent who had worked on the matter. Elizondo's brother testified that Elizondo had been tortured and murdered. Over several objections by Cepeda's counsel, the government offered two pictures of Elizondo's body, showing bullet wounds, asphyxiation marks, and bruising.

Throughout this testimony, Cepeda objected to the admission of evidence and moved to sever multiple times. The court denied each request yet gave the jury several limiting instructions. The court explained that Rule 404(b) evidence "only can be used for determining motive, intent, that sort of thing, of the person about whom it's being spoken" and "in this case, that would be Mr. Ledezma." At the close of the government's case in chief, Cepeda re-urged his motion to sever, which the court again denied. The government reiterated the multiple murders once more at the close of evidence, and the court gave a final limiting instruction.

The jury deliberated for one day before finding Ledezma and Cepeda

No. 16-11731

guilty of interstate stalking and conspiracy to commit murder for hire and Cepeda guilty of tampering with documents or proceedings. Both were sentenced to life imprisonment.

## II.

### A. Cepeda's Severance Claim

Federal Rule of Criminal Procedure 14 provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials . . . or provide any other relief that justice requires." Cepeda claims the district court committed reversible error in denying his request to sever.

That contention faces a doubly high burden. In the first instance, we review the decision not to sever "under the exceedingly deferential abuse of discretion standard." *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017) (quotations omitted). And, as a substantive matter, our caselaw does not reflect a "liberal attitude toward severance." *United States v. McRae*, 702 F.3d 806, 822 (5th Cir. 2012). Severance is an *exception*, *id.* at 821, warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *Zafiro v. United States,* 506 U.S. 534, 539 (1993). This presumption stems from the belief that "[d]efendants who are indicted together should generally be tried together, particularly in conspiracy cases,"[2] because joint trials "promote efficiency" and protect against the "inequity of inconsistent verdicts."[3]

---

[2] *United States v. Musquiz,* 45 F.3d 927, 931 (5th Cir. 1995); *see also Zafiro,* 506 U.S. at 537 ("There is a preference in the federal system for joint trials of defendants who are indicted together.").

[3] *Zafiro*, 506 U.S. at 537 (quotations omitted).

## No. 16-11731

To surmount this heavy presumption, a defendant must show that "(1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration."[4] Generic allegations of prejudice will not suffice, for "neither a quantitative disparity in the evidence nor the presence of a spillover effect requires a severance."[5] Additionally, in conspiracy cases we generally favor specific instructions over severance. That is because it is "generally 'presume[d]' that juries 'follow the instructions given to them by the district court'"[6] and are capable of "compartmentaliz[ing] the evidence against each defendant."[7] Hence, Cepeda must identify specific instances of prejudice unremedied by limiting instructions.[8]

Cepeda's main argument is that the jury likely considered the voluminous Rule 404(b) evidence about Ledezma against Cepeda and imputed "guilt by association." To undermine his defense of duress, the government introduced evidence of Ledezma's participation in as many as nine additional murders; but that also had the effect of subtly eroding Cepeda's contention that he lacked the requisite intent "to kill, injure, harass, and intimidate Chapa" because he believed Ledezma to be a legitimate private investigator on a valid assignment.

---

[4] *United States v. Owens*, 683 F.3d 93, 98 (5th Cir. 2012) (quotations omitted).

[5] *United States v. Krout*, 66 F.3d 1420, 1430 (5th Cir. 1995); *Owens*, 683 F.3d at 98.

[6] *Chapman*, 851 F.3d at 380 (quoting *Owens*, 683 F.3d at 100); *United States v. Cihak*, 137 F.3d 252, 259 (5th Cir. 1998).

[7] *United States v. Tarango*, 396 F.3d 666, 677 (5th Cir. 2005); *see, e.g.*, *United States v. Harrelson*, 754 F.2d 1153, 1174 (5th Cir. 1985) (holding that jury instruction remedied the spillover effects from a codefendant "murderer for hire").

[8] *See Chapman*, 851 F.3d at 380 (requiring a party "show the specific and compelling prejudice necessary to warrant vacatur"); *see also United States v. Rocha,* 916 F.2d 219, 229 (5th Cir. 1990).

Cepeda emphasizes that the evidence was particularly gruesome. The jury saw photographs of a victim with bullet wounds in his chest and asphyxiation marks around his neck, and it heard about how Ledezma crossed names off in a little notebook as victims fell to the cartel. According to Cepeda, evidence of this kind would "make [any] jury feel it would be impossible for any reasonable person to rely on Ledezma."

Cepeda also claims to have identified several instances of specific, unremedied prejudice from the failure to sever. First, the government allegedly "invited the jury to speculate" that he had been involved in Elizondo's murder by eliciting testimony that Ledezma and Cepeda crossed into the United States together nine days before Elizondo's murder and that $8,000 appeared in Cepeda's bank account the same day. After eliciting that testimony, the prosecutor stated, "Okay. I want to move on from the killing of Mr. Elizondo," which Cepeda interprets as a suggestion he was involved in the murder.

Second, the court overruled defense counsel's Federal Rule of Evidence 404(b) and 403 objections to the government's questions about Ledezma's notebook, and the government then discussed another of Ledezma's victims. According to Cepeda, "the district court's abrupt ruling and lack of limiting instruction" created the appearance that "Cepeda's counsel was wrong to object and [the jury] [was] permitted to consider that evidence against Cepeda."

Third, the government "sandwich[ed]" questions to Ledezma about extraneous murders in between questions about Cepeda's assistance tracking Chapa, intimating that Cepeda was involved in those as well. And fourth, the charge to the jury was "hopelessly conflicted"—it first gave a boilerplate instruction about extraneous offenses but later instructed the jurors they could consider "against any defendant any acts done or statement made by any members of the conspiracy, during the existence of and to further the objectives

of the conspiracy . . . even if they were done and made in a particular defendant's absence and without his or her knowledge."

None of these contentions reveals a degree of prejudice sufficient to overcome our extreme deference to the district court's discretion. As an initial matter, Cepeda's various interpretations of the above events, and the kind of speculation that they might invite, are contestable at best. But regardless, an "invitation to speculate" and potentially confusing out-of-order questions do not rise to the level of specific compelling evidence. And as for the jury charge, there was no confusion: The murder of Elizondo plainly did not "further the [conspiracy's] objective[]" of murdering Chapa. Most importantly, the court dispelled any scent of ambiguity or prejudicial inference by carefully and repeatedly instructing the jury, throughout trial, that it consider the Rule 404(b) evidence as admissible *only against Ledezma* and *only for limited purposes*.

Cepeda cites several authorities as standing for the proposition that the volume and gruesome nature of the Rule 404(b) evidence against Ledezma render the instructions insufficient. But each of those cases is easily distinguishable: In each, the prevailing party was not a member of the conspiracy or had committed crimes qualitatively less severe than those of his co-defendants. [9] In contrast, Cepeda and Ledezma were charged *together*, for the

---

[9] *See, e.g., United States v. Cortinas*, 142 F.3d 242, 248–49 (5th Cir. 1998) (finding limiting instructions inadequate where defendants were charged with money laundering and drug possession as part of a conspiracy that also involved a violent biker gang that had murdered a young boy, when the defendants had withdrawn from the conspiracy *before* the gang had joined); *McRae*, 702 F.3d at 813–19, 824 (finding prejudice in the failure to sever where the non-conspiracy defendant-appellant police officer was accused of excessive force and unlawful discharge of a firearm for shooting a man he believed to be a threat, whereas conspiring codefendant-officers were charged with civil-rights violations including burning a dead body, severely beating citizens, and covering up misdeeds through false statements to the FBI and false reports); *United States v. Erwin*, 793 F.2d 656, 665–66 (5th Cir. 1986) (rejecting, in wide-ranging drug conspiracy, several of defendants' arguments that their trafficking, counterfeiting, and perjury charges "differed qualitatively" from the evidence of kidnappings and killing presented at trial, but accepting the argument of one non-conspiring

very *same crime*, committed at the *same time*. At bottom, Cepeda's appeal is based on no more than a discrepancy in the quantity (rather than quality) of crimes and general "spillover" concerns—precisely the type of codefendant evidence we presume limiting instructions can cure.[10] Because the district court "ably parsed" the evidence and "instructed the jury many times . . . to consider certain evidence only against [Ledezma] [and] only for limited purposes,"[11] it did not abuse its discretion by denying Cepeda's multiple motions to sever.

## B. Ledezma's Claims

Ledezma claims the district court erred in finding the evidence sufficient, in excluding testimony by his expert, and in overruling one of his Rule 403 objections to photo evidence of the Elizondo murder. Because none of these arguments is sufficiently briefed, each is waived. *United States v. Fisch*, 851 F.3d 402, 410 (5th Cir.), *cert. denied*, 138 S. Ct. 378 (2017). And regardless, all are meritless. The evidence supporting Ledezma's conviction was legion; he failed to object at trial to the exclusion of the expert testimony and fails to brief plain error, let alone any error, on appeal, *see id.* at 409 n.4; and the record reveals the district court's careful engagement in Rule 403 balancing. Ledezma's appeal is both meritless and insufficiently developed.

AFFIRMED.

---

defendant accused of a single count of perjury only "peripherally related" to evidence of violent crimes).

[10] *Krout*, 66 F.3d at 1430; *Chapman*, 851 F.3d at 380 (rejecting appellant's severance arguments "because they are limited to alleging this general spillover effect" and "fail[] to show the specific and compelling prejudice necessary to warrant vacatur"); *Owens*, 683 F.3d at 98 ("A spillover effect, by itself, is an insufficient predicate for a motion to sever." (cleaned up) (quotation omitted)); *see also Harrelson*, 754 F.2d at 1175 ("[T]he circumstance that one has chosen odious associates seems a dubious sword.").

[11] *United States v. Posada-Rios*, 158 F.3d 832, 864–65 (5th Cir. 1998).