# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-31299

United States Court of Appeals
Fifth Circuit

**FILED**
October 31, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

TINGHUI XIE, also known as Kelly Xie, also known as Kelly Liu,

Defendant - Appellant

Appeal from the United States District Court
for the Middle District of Louisiana

Before DAVIS, GRAVES, and HIGGINSON, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this insider trading case, defendant-appellant Kelly Liu[1] was convicted of one count of conspiracy to commit securities fraud in violation of 18 U.S.C. §§ 2 and 371 and two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78(ff). On appeal, Liu challenges the sufficiency of the evidence supporting her conviction. She also contends the district court abused its discretion in denying her a severance. Concluding that the evidence was

---

[1] Defendant-appellant Tinghui Xie has been referred to as "Kelly Liu," the name by which she is generally known, throughout these proceedings.

sufficient and that the district court did not abuse its discretion in denying a severance, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the verdict, the relevant facts are as follows.[2] In March 2012, Chicago Bridge and Iron, N.C. ("CB&I") expressed interest in acquiring The Shaw Group ("Shaw"). Both companies were publicly traded, and both had approximately $6 billion in revenue. By May 2012, Toshiba Corporation ("Toshiba") became interested in joining CB&I, and the two companies approached Shaw to discuss an acquisition. The next two months saw both sides hurriedly conduct their due diligence to obtain information in preparation for the possible acquisition. At some point prior to July 4, 2012, Toshiba dropped out, but CB&I never wavered in its negotiations to acquire Shaw. On July 4, 2012, Shaw and CB&I reached a tentative deal, and after final due diligence, CB&I on July 30, 2012 announced its agreement to acquire Shaw.

Defendant-appellant Kelly Liu ("Liu") took an active role in obtaining Shaw's financial information to satisfy CB&I's due diligence requests. Liu had been in Shaw's five-person Financial Planning & Analysis Group (FP&A) since 2011. As such, Liu was no stranger to due diligence; she had worked on several of Shaw's acquisitions of smaller companies. Her group regularly assisted with market analysis and due diligence for these acquisitions, and thus became familiar with the high level of secrecy involved in handling this information. Because of her access to restricted information, Shaw considered her an "insider" and provided her and others in her department the company's policy on insider trading.

---

[2] *Glasser v. United States*, 315 U.S. 60, 80 (1942) (overruled on other grounds).

No. 18-31299

As Liu and her team conducted final due diligence in the weeks leading up to the closing, Liu's codefendants purchased Shaw stocks and call options. The trial centered on the actions of Liu, together with Salvador "Sammy" Russo, III ("Russo"), Diemo Ho ("Diemo"), and Victory Nam Ho ("Vic"). Codefendant Russo was Liu's live-in boyfriend at the time of the offense. The two had been dating since 2006. Diemo was their neighbor and Liu's close friend. Codefendant Vic was Diemo's older brother and an acquaintance of Liu's.[3]

From July 18 to 27, 2012, a flurry of communications occurred between the above parties. Call records revealed a pattern: Liu and Diemo would communicate by phone or text, Diemo would immediately thereafter phone or text Vic, and Diemo would then quickly phone or text Liu. Conversations peaked on the days Vic and Russo purchased stocks and options in Shaw; the communications between the parties throughout July were strikingly high. During some of these conversations, IP addresses[4] used by Liu and Diemo accessed Vic's brokerage account to investigate Shaw stock price. Russo directed his mother to purchase stocks on July 19, 2012, and Vic purchased his Shaw call options eight days later. When Vic purchased his options, he wrote to a representative of optionsXpress in a recorded online chat to confirm that he could sell the options on July 30, 2012, the day Shaw announced the acquisition.

Following the July 30 announcement of CB&I's purchase of Shaw, the price of Shaw stock rose roughly $15 per share. Within forty minutes of the announcement, the parties again communicated back and forth. Russo held onto the stock in his mother's account, eventually making a $2800 cash profit.

---

[3] All three participated in a fantasy football league together.

[4] An internet protocol address, commonly referred to as an IP address, is a unique number assigned to an internet user that identifies a device connected to the internet.

No. 18-31299

Vic, meanwhile, sold his Shaw call options on July 30 for a profit of $294,000 (over 3500% in gains).

When Vic filed his 2012 tax returns, he failed to report these profits despite receiving a 1099 tax form. After his tax preparer reminded him to pay taxes on gains, Vic responded that he was "in trouble," but he did not seek to amend his 2012 return. During trial, the district court provided limiting instructions to the jury regarding their consideration of the evidence of Vic's failure to report his capital gains when evaluating the charges against Liu.

The indictment charged Liu with committing insider trading and entering into a conspiracy with Russo and Vic to do so. Before trial, the district court rejected Liu's pre-trial motion for severance, and the motion was re-urged and denied at every available opportunity. Liu filed her timely notice of appeal a week after the court imposed her sentence of sixteen months per count to run concurrently.

## II. DISCUSSION

### A. Insider Trading Elements

Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 impose civil and criminal liability for insider trading. The Act "prohibit[s] undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage."[5] In *Dirks v. SEC*, the Supreme Court held that when a corporate insider shares material, nonpublic information with someone in breach of his or her fiduciary duty for personal gain, the corporate insider may be held liable as a "tipper."[6]

---

[5] *Salman v. United States*, 137 S. Ct. 420, 423 (2016); *see* 15 U.S.C. §§ 78j, 78ff; 17 C.F.R. §§ 240.10b-5.

[6] 463 U.S. 646, 659, 662 (1983).

No. 18-31299

Consistent with Supreme Court precedent, the district court instructed the jury of the following six elements required to convict a tipper of insider trading: (1) that the defendant disclosed material, nonpublic information to another person, (2) that the disclosure was made for personal purpose in breach of the defendant's fiduciary duty as a corporate insider, (3) that the defendant anticipated that the other person would trade on the basis of the information, (4) that the other person unlawfully traded, (5) that the defendant acted knowingly, willfully, and with the intent to defraud, and (6) that the insider trading scheme involved the use of some instrumentality of interstate commerce.[7]

### 1. Sufficiency of the Evidence

This court reviews preserved challenges to the sufficiency of the evidence de novo.[8] "Though de novo, this review is nevertheless highly deferential to the verdict."[9] Under this standard, "the relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[10] This court must "view the evidence in the light most favorable to the verdict and draw all reasonable inferences from the evidence to support the verdict."[11] "Determining the weight and credibility of the evidence is within the sole province of the jury."[12]

---

[7] On appeal, Liu does not challenge the jury instructions, which accurately set forth the elements of tipper liability for insider trading. *See Salman*, 137 S. Ct. at 423; *United States v. O'Hagan*, 521 U.S. 642, 651–653 (1997); *Dirks*, 463 U.S. at 654; 15 U.S.C. §§ 78j and 78ff; 17 C.F.R. §§ 240.10b-5 and 240.10b5-1.

[8] *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016).

[9] *United States v. Carbins*, 882 F.3d 557, 563 (5th Cir. 2018) (internal quotation marks and citation omitted).

[10] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[11] *United States v. Martinez*, 900 F.3d 721, 728 (5th Cir. 2018) (internal quotation marks, alteration, and citation omitted).

[12] *United States v. Hayes*, 342 F.3d 385, 389 (5th Cir. 2003).

No. 18-31299

Liu challenges the sufficiency of the evidence to establish that she possessed and disclosed material, nonpublic information, and that she acted with scienter to support her conviction for insider trading. She also challenges the sufficiency of the evidence to show that she conspired with her codefendants to commit insider trading. Each of these issues will be discussed in turn.

**a. Possession**

Liu first argues that the evidence was insufficient to show that she possessed any information concerning the buyout. Specifically, she stresses that she merely had *potential* access to information, which is insufficient to establish possession.

The Government, however, presented evidence showing that Liu deduced that an acquisition was about to occur. On May 29, 2012, Liu received CB&I and Toshiba's 22-page due diligence request for "Project Jewel," a code name for the acquisition. This was followed by a number of other requests for additional information. CFO Brian Ferraioli testified that a member of FP&A "could easily have inferred" from the due diligence requests that a company was seeking to purchase Shaw. In addition, FP&A Manager Rebecca Wallace testified that she and Liu took a private phone call from a Morgan Stanley investment banker on July 16, 2012 while at lunch, discussing "sensitive information" concerning EBITDA (an important metric for a buyout).[13] Wallace stated it was "pretty easy to guess" what was happening, both from the involvement of investment bankers and the inquiry about EBITDA. Liu's group also assisted in the buyout by running the "Maggie"[14] forecasting model

---

[13] EBITDA is a company's net income with its interest, taxes, depreciation, and amortization added back. *See generally Gen. Elec. Capital Corp. v. Posey*, 415 F.3d 391, 393 (5th Cir. 2005).

[14] Maggie is a long-term financial projection model that Morgan Stanley used to assess Shaw's intrinsic value.

for Morgan Stanley, which assessed Shaw's worth for the acquisition. FP&A updated Maggie at least twice in May and June 2012, which was atypical; ordinarily Maggie was updated every six months. Liu's coworker James McMahon (a member of the FP&A team) testified that based on these updates he believed Shaw was selling itself and assumed Liu, who had this same information, believed the same.

The Government presented evidence that Liu had been told of the impending sale. CFO Ferraioli testified that he told Wallace about the planned sale of Shaw weeks before Shaw announced the deal, and coworker Meredith Guedry (a member of the FP&A team) in turn testified that Wallace told her team, including Liu, about CB&I's pending acquisition of Shaw prior to the announcement.[15] Guedry's detailed testimony about her conversations with Liu in June added credibility to her conclusion that she had "no doubt" Liu knew that the sale was pending. Indeed, Guedry explained that she and Liu discussed the acquisition at length. Fearing her job was at risk due to the acquisition, Guedry left Shaw's Baton Rouge office in late June; Guedry testified that Liu knew why she was leaving and agreed with her decision.

Liu relies on three district court cases to argue this evidence was insufficient to establish possession, yet they are all readily distinguishable. First, in *S.E.C. v. Horn*, the Northern District of Illinois held that while the defendant had potential access to information, that alone could not establish possession of material, nonpublic information.[16] Similarly, in *S.E.C. v. Truong*, the Northern District of California concluded that there was no evidence that the defendant had trading information, for he "was not made privy to

---

[15] The jury could have similarly relied on Wallace's testimony that Liu relayed to the FP&A group talk she had heard from Shaw's Environment and Infrastructure Division that "the deal is still on."

[16] No. 10-CV-955, 2010 WL 5370988, at *6 (N.D. Ill. Dec. 16, 2010).

confidential sales and financial information in the normal course of his duties."[17] Lastly, in *S.E.C. v. Schvacho*, the Northern District of Georgia, after conducting a bench trial, determined that a correlation between stock purchases and a few phone calls between two friends required too much conjecture.[18] In contrast to these cases, the evidence adduced at trial provided the jury with a sufficient basis to conclude that Liu actually possessed information about the impending sale of Shaw.

### b. Materiality

Liu next argues that the evidence was insufficient to show that the information she possessed concerning the acquisition of Shaw was material. Liu underscores that any information she possessed was speculative and founded on rumor.

Based on Supreme Court precedent, the district court charged the jury without objection that information is material "if a reasonable investor would consider it significant in the decision whether to invest, such that it alters the total mix of information available about the proposed investment."[19] The court also clarified that "confirmation by an insider of facts or rumors that the company had not confirmed publicly itself may constitute material, nonpublic information."

As materiality "depends on the facts," it "is to be determined on a case-by-case basis."[20] While this court has not addressed this issue in the context of tipper liability, the Second Circuit has. In *United States v. Mylett*, for example,

---

[17] 98 F. Supp. 2d 1086, 1089 (N.D. Cal. 2000).

[18] 991 F. Supp. 2d 1284, 1299 (N.D. Ga. 2014).

[19] In *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), the Supreme Court held that, in the proxy-solicitation context, an omitted fact was material if a reasonable investor would consider it "as having significantly altered the 'total mix' of information available." Then, in *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988), the Court expressly adopted that standard in the § 10(b) and Rule 10b-5 context.

[20] *Id.* at 250.

the defendant, the Vice President of Labor Relations at AT&T, told his friend that a newspaper article speculating a merger between AT&T and an unnamed company was true, because he had conducted a feasibility study of the merger and had been told by his supervisor not to discuss the article.[21] On appeal, the court determined that a reasonable investor would find this information valuable, even if the merger was speculative. It held that a $6 billion acquisition could be considered "an event of great magnitude," in part due to the "sharp jump" in the stock price after the announcement.[22] The court also found that there was a high probability of acquisition because the company had hired an investment bank, outside counsel, and accountants in preparation.[23] Similarly, in *S.E.C. v. Mayhew*, the Second Circuit held that a tip to the defendant that an acquisition was in the works was material.[24] The court concluded that because the information came from an insider and the merger discussions were "actual and serious," a "lesser level of specificity" was necessary to constitute material information.[25]

On the other hand, the Fourth Circuit in *Taylor v. First Union Corp.* held that information being withheld concerning talks between banks did not constitute material information.[26] Two banks in separate states held a meeting to discuss the possibility of "developing a relationship."[27] Following a Supreme

---

[21] 97 F.3d 663, 666 (2d Cir. 1996).

[22] *Id.* at 667.

[23] *Id.*

[24] 121 F.3d 44, 52 (2d Cir. 1997).

[25] *Id. See also United States v. Cusimano*, 123 F.3d 83, 86 (2d Cir. 1997) (holding that a tip that "something was happening" between two companies, although the tipper "wasn't sure what," was still material); *Holmes v. Bateson*, 583 F.2d 542, 558 (1st Cir. 1978) (determining that information of a possible merger was material although the specifics had not yet been settled); *S.E.C. v. Shapiro*, 494 F.2d 1301, 1306–07 (2d Cir. 1974) (concluding that while the merger was not probable, the "possibility was not so remote that . . . it might not have influenced a reasonable investor").

[26] 857 F.2d 240, 242 (4th Cir. 1988).

[27] *Id.*

Court decision declaring interstate banking to be constitutional, the two banks again met, this time to consider a merger. The Fourth Circuit determined that those discussions were "preliminary, contingent, and speculative."[28] "At best, the merger discussions culminated in a vague 'agreement' to establish a relationship," with "no agreement as to the price or structure of the deal."[29]

This present case poses a stark contrast to *Taylor*. The information available to Liu in May 2012 when CB&I sent its 22-page due diligence request showed that the companies' negotiations concerning a possible sale of Shaw were quite serious. As the summer progressed, Liu observed that Maggie had been updated out of cycle. She also participated on multiple calls with Morgan Stanley bankers who, referencing "the other side," discussed the metric. Other members of FP&A eventually informed her that Shaw was being bought. Liu emphasizes that she did not know the price or other details of the deal, such as the buyer's identity, but materiality in this instance does not demand that the tipper know all the details of the proposed transaction. Here, talks of an acquisition were far beyond speculation. That the information came from Liu, a deemed "insider," made it all the more likely to affect the mix of total information available for the reasonable investor. Thus, the jury had sufficient evidence to conclude the information was material.

### c. Nonpublic

Liu makes a conclusory claim that the information in question was public. Arguments not briefed are waived.[30] In any event, the information surrounding Shaw's acquisition was clearly nonpublic. Information becomes public when it is disclosed "to achieve a broad dissemination to the investing

---

[28] *Id.* at 244.

[29] *Id.*

[30] *See United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (holding a failure to fully brief constitutes a waiver).

public generally and without favoring any special person or group."[31] Here, the evidence sufficiently showed that CB&I and Shaw kept the deal a secret until they announced the acquisition. Indeed, the companies went to great lengths to keep discussions confidential. Directors of both companies testified that they used code names, had access-controlled electronic data rooms, and executed confidentiality agreements.

### d. Disclosure

Liu also argues that the Government failed to show that she disclosed this material, nonpublic information to Russo and Vic. She contends that communications between the parties, even if "timely," were not so unusual as to reveal Liu disclosed any information about the buyout.

The striking concert of action between Liu and her codefendants, however, presented a different tale to the jury. The phone records show that Liu, Vic, and Russo coordinated with one another at the precise times that Vic purchased Shaw call options and Russo's mother purchased Shaw stock. The jury was entitled to find the timing of the communications revealing: Liu spoke with Russo numerous times, and she communicated with Diemo, who in turn spoke to Vic, repeatedly.[32] The highest volume of phone communications between Liu and Diemo in 2012 occurred in July, the most notable days being July 18, 19, and 30. Vic and Diemo also had the highest volume of phone communications between them in July 2012, similarly peaking on July 19 (when Vic first ordered Shaw call options).

---

[31] *Dirks v. S.E.C.*, 463 U.S. 646, 653 n.12 (1983) (citing *In re Faberge, Inc.*, 45 S.E.C. 249, 256 (1973)). The district court further instructed the jury that a "tip from a corporate insider that is more reliable or specific than public rumors is nonpublic information despite the existence of such rumors in the media or investment community."

[32] For example, on July 26 (the day before the trades), Diemo and Liu exchanged 66 calls and texts. Diemo and Vic exchanged 22 calls and texts.

No. 18-31299

Moreover, the Government produced more concrete evidence that these communications concerned Shaw's pending acquisition. Russo's mother testified to a grand jury that Liu admitted to her that she passed on the information about the pending Shaw buyout.[33] In addition to this direct testimony, the call records support an inference that Liu relayed her knowledge about the impending sale to Russo and Vic. On July 18, 2012, Liu and Russo exchanged a series of phone calls and texts. Immediately thereafter, Russo called his mother and asked permission to buy Shaw stock in her brokerage account, explaining he knew of rumors of an acquisition. Similarly, on July 19, 2012, Liu spoke with Diemo, who in turn spoke with Vic. Vic then contacted his brother, Chris Ho ("Chris"). Chris promptly called his brokerage firm on a recorded line to inquire into purchasing options for Shaw. During the call, he told the agent, "That's all I needed to know, 'cause you know how it is. Everybody always gets a tip. . . . [From] a friend of a friend and from a janitor."[34] Finally, while Vic was communicating with his broker, a user logged onto Vic's brokerage account from a device Liu regularly accessed and researched Shaw call options. The jury could infer Liu was the user who logged into the account to assist Vic in purchasing the call options. The evidence was

---

[33] Liu contends that this evidence could only be used for impeachment purposes. This is incorrect. Ms. Russo's prior grand jury statement, while posing two layers of hearsay issues, is nonetheless admissible substantively. First, her statement as to what Liu told her is admissible under Rule 801(d)(2) of the Federal Rules of Evidence as an exclusion from hearsay, since Liu's statement is a party admission. Second, Ms. Russo's grand jury testimony satisfies the requirements of another exclusion from hearsay, Rule 801(d)(1)(A), as Ms. Russo testified under oath at a proceeding, and she is now subject to cross-examination about her earlier statement. Further, there is no Confrontation Clause issue; if Russo wanted to cross-examine his mother about why she made the prior statement, he had that opportunity.

[34] Vic's friend Lance Burgos also testified that Vic called him that day to inform him of the acquisition rumors. Despite his familiarity with the stock market, Burgos stated Vic's information came as a surprise to him.

thus sufficient for the jury to find that Liu passed on to Russo and Vic her knowledge about the pending acquisition of Shaw.

### e. Personal Benefit

The Government had to demonstrate that Liu disclosed this aforementioned information for a personal purpose in breach of her fiduciary duty as a corporate insider.  Liu does not contest that she was a corporate insider. Further, she concedes that, in regard to receiving a personal benefit, she "had a close personal relationship with Russo and Diemo Ho in July 2012" that "[a]s a matter of law . . . [is] sufficient to infer a personal benefit if [she] disclosed material nonpublic information for securities trading purposes."

### f. Anticipation of Trade

Liu asserts that even if she shared material, nonpublic information, she did not do so with any intention that Vic or Russo trade on it. Insider trading requires that a tipper's "deceptive use of information be in connection with the purchase or sale of a security."[35] Liu argues that, if anything, she told Russo *not* to trade Shaw stock.

The jury had reason to conclude otherwise, for the reasons stated above. The jury was entitled to find that, because Liu was researching Shaw call options from Vic's account apparently to assist in purchasing the options, she understood precisely what Vic was in the process of doing: purchasing Shaw call options based on the information she furnished him about Shaw's potential acquisition. Additionally, on July 27, 2012, the date that Vic purchased his Shaw call options and nine days after the flurry of communication began, Vic asked his broker if he could sell his options on July 30, the date that CB&I announced its purchase of Shaw. A reasonable juror could find that Liu

---

[35] *United States v. O'Hagan*, 521 U.S. 642, 655–56 (1997).

conveyed the approximate date of the acquisition to Vic, so he could purchase and sell Shaw options on the most advantageous dates.

### g. Unlawful Trade

The Government had to show that Vic and Russo actually traded (i.e., bought or sold) Shaw securities. The Government provided sufficient evidence that Vic and Russo did so. The jury saw records from Vic's optionsXpress account and Russo's mother's brokerage account at Edward Jones (in which he had a beneficial interest) that showed both parties, acting on the information Liu provided, purchased Shaw stock or options.

### h. Scienter

Liu contends that the evidence was insufficient to prove she acted with the requisite scienter to commit securities fraud. That is, Liu argues that she did not act knowingly, willfully, and with the intent to defraud.[36] The district court defined "knowing" for the jury as requiring Liu acted voluntarily and intentionally, not because of mistake or accident. It defined "willfully" to mean that Liu acted purposely with the specific intent to either disobey or disregard the law. Lastly, it defined "specific intent to defraud" as to act with an intent to deprive Shaw of the confidentiality of its material, nonpublic information.

The Government provided the jury with sufficient evidence that Liu knew the trading scheme was unlawful and nevertheless participated. As a member of FP&A, Liu received training on insider trading and handling confidential corporate information.[37] She also knew that, as an "insider," she could not trade during blackout periods, and Shaw sent quarterly emails reminding her of this policy. The policy explicitly stated she could not "pass on

---

[36] *See Dirks*, 463 U.S. at 664 n.23 (1983).

[37] The Shaw Group Code of Corporate Conduct explicitly defined material information as information "that is important to a reasonable investor in deciding whether to buy or sell a company's stock or other securities." It also listed acquisitions as an example of material, nonpublic information.

to others" any material, nonpublic information. She would have understood that any information concerning a potential merger was confidential, yet she shared it anyway. In addition, the Government produced evidence that Liu lied to the FBI and IRS in 2014, claiming that she did not know about the merger prior to the announcement, despite having been emailed that the acquisition cleared the day before. A jury was entitled to find that Liu acted with the requisite scienter.

### i. Interstate Commerce

To be convicted of insider trading, Liu had to have used some instrumentality of interstate commerce. The instrumentality could be a telephone, the internet, mail, or the facilities of a national securities exchange. Liu does not contest that the scheme involved an instrumentality of interstate commerce.

### B. Conspiracy

Liu argues that the evidence was insufficient to prove a conspiracy to commit securities fraud. For the Government to prove a conspiracy under 18 U.S.C. § 371, it had to show "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy."[38] "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances."[39] A conspiracy "may be established by either direct or circumstantial evidence."[40] Liu argues

---

[38] *United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010).

[39] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) (internal citations and quotation marks omitted).

[40] *United States v. Abadie*, 879 F.2d 1260, 1265 (5th Cir. 1989).

the Government failed to demonstrate she intentionally entered into an agreement to commit insider trading, as the communications between parties would have happened regardless of any conspiracy.

As the above elements of insider trading illustrate, however, the Government offered sufficient evidence to demonstrate Liu provided inside information to Russo and Vic and voluntarily agreed to join them in committing insider trading. The back-and-forth communications and subsequent trades, meanwhile, constitute overt acts in furtherance of the conspiracy. Therefore, Liu's challenge to her conspiracy conviction fails.

## C. Severance

Liu contends that this court should vacate her conviction and remand for a new trial because the district court abused its discretion in failing to grant a severance and try her separate from Vic and Russo. Rule 14 of the Federal Rules of Criminal Procedure allows severance as justice requires. Prejudice alone, however, does not mandate severance; rather, Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."[41] A severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[42] "There is a preference in the federal system for joint trials of defendants who are indicted together."[43]

This court reviews a district court's failure to sever a defendant from a trial by the "exceedingly deferential" abuse of discretion standard.[44] The appellant must show that "(1) the joint trial prejudiced him to such an extent

---

[41] *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993).

[42] *Id.* at 539.

[43] *Id.* at 538.

[44] *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017) (quoting *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009) (internal quotation marks omitted).

that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration."[45] In conspiracy cases, this court "generally favor[s] specific instructions over severance."[46] "A spillover effect, by itself, is an insufficient predicate for a motion to sever."[47]

Liu argues that the district court erred in not granting a severance for two reasons. First, she contends that the evidence regarding Vic's tax fraud, including his remark that he was "in trouble" to his tax preparer, would have been inadmissible against her because it was irrelevant; she also argues that jury instructions failed to cure prejudice. Second, Liu argues that Chris's statement that he received a tip would have been inadmissible against her, because Chris was neither an alleged coconspirator nor a tippee.

Most of the evidence against Vic that Liu complains is prejudicial would have been admissible against her in a separate trial. Even if isolated items of evidence were not admissible against Liu, the district court's instructions provided her with adequate protection. Specifically, the district court instructed the jury that "sometimes an exhibit may be admissible only as to one defendant and not the others," and Vic's tax fraud was "such [an] exhibit[] and may be considered only insofar as defendant Victory Ho is concerned, but should not be considered as to defendants Kelly Liu and Salvador Russo." Liu fails to show the prejudice required for a severance, and her challenge to the district court's denial of her motion to sever is thus without merit.

## III. CONCLUSION

For these reasons, we AFFIRM the district court's judgment.

---

[45] *United States v. Owens*, 683 F.3d 93, 98 (5th Cir. 2012) (internal quotation marks omitted).

[46] *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018).

[47] *United States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002).