# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 17, 2021

Lyle W. Cayce
Clerk

No. 20-40393

United States of America,

*Plaintiff—Appellee*,

*versus*

Armando Moya,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:18-CR-6-1

Before Higginbotham, Willett, and Duncan, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Armando Moya appeals his conviction for possessing a gun in furtherance of a drug trafficking conspiracy. He also appeals a forfeiture order attributing to him the entire proceeds of that conspiracy. We affirm Moya's conviction but vacate the forfeiture award. The forfeiture was plainly erroneous under *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), because it imposed joint and several liability for proceeds Moya did not personally obtain. So we vacate the forfeiture and remand for further proceedings.

No. 20-40393

## I.

In June 2018, federal agents caught Jose Roberto Moya ("Jose") and others smuggling illegal drugs from Mexico into Texas. Jose admitted that, for about two years, he had been delivering narcotics to his brother, Armando Moya ("Moya"). Moya would distribute the drugs throughout the United States and bring the proceeds back to Jose, who would take them to "the boss down in Mexico," Don Roberto. Moya later admitted to transporting ten bundles of narcotics on each of seven trips, receiving up to $1,000 per bundle plus expenses. The value of the drugs Moya and his co-conspirators moved was between $3.9 and just over $5 million.

Armed with a warrant, agents searched Moya's house and found three boxes containing a total of $198,184 in cash, separated by denomination and bundled with rubber bands. One of the boxes also contained a Raven .25 semiautomatic pistol and two boxes of ammunition.[1] Moya claimed the gun was a gift from his father, which he kept for "his protection" and stored in the closet to keep from his children. He admitted the money in the box with the gun was his but claimed it was profits from a logging business and the sales of his four wheeler and trailer. As for the other two boxes, Moya claimed that they had been left on his doorstep by persons unknown and that he was unaware of their contents.

In February 2019, Moya was indicted for conspiring to distribute and to possess with intent to distribute 1 kilogram or more of heroin, 400 grams or more of fentanyl, and 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) ("Count One"); and for using, carrying, and possessing a firearm during and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Two"). Moya proceeded to

---

[1] While the photo exhibits show two boxes of different ammunition, at trial the officer testified only that there was "ammo" in the cash box.

trial. At the close of the government's case, and again at the close of his own, Moya moved for acquittal on both counts based on insufficient evidence under Federal Rule of Criminal Procedure 29. With respect to Count Two, he contended the government had not shown the pistol was possessed in furtherance of the drug offense because there "ha[d] to be more of a nexus between the firearm and the offense." The court denied the motion. The jury found Moya guilty on both counts.

In line with Moya's presentence report ("PSR"), the government argued for a life sentence. It also sought two enhancements: a three-level increase based on Moya's managerial or supervisory role in the conspiracy, per U.S.S.G. § 3B1.1(b), and a two-level increase based on his alleged direct involvement in importing a controlled substance, per § 2D1.1(b)(16)(C). Moya objected. Although the court agreed with the government about the enhancements, it declined to impose the life sentence recommended by the Guidelines, granting Moya's motion for a variance instead. Considering the 18 U.S.C. § 3553(a) factors, particularly Moya's lack of criminal history and strong family and community ties, the court sentenced him to 260 months' imprisonment for Count One and 60 months' imprisonment for Count Two, to be served consecutively. It ordered forfeiture of the $198,184 seized from Moya's residence and $4 million representing the amount of drug proceeds Moya obtained. Moya timely appealed.

On appeal, Moya raises two issues. He argues, first, that his firearm conviction was not supported by sufficient evidence and, second, that the district court erred by ordering forfeiture of $4 million in drug proceeds.

## II.

We review Moya's preserved challenge to the sufficiency of the evidence *de novo. United States v. Martinez*, 900 F.3d 721, 727 (5th Cir. 2018). Our review is "highly deferential to the verdict." *United States v. Tinghui Xie*, 942 F.3d 228, 234 (5th Cir. 2019) (quoting *United States v. Carbins*, 882

F.3d 557, 563 (5th Cir. 2018)). Viewing the evidence most favorably to the verdict, we ask whether "a reasonable juror could conclude that the elements of the crime were established beyond a reasonable doubt." *United States v. Evans*, 892 F.3d 692, 702 (5th Cir. 2018).

Conversely, we review Moya's challenge to the forfeiture for plain error because Moya (as he concedes) failed to object in the district court. Accordingly, we will reverse only if there was error that is "plain" and "affects [Moya's] substantial rights," and even then, only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)); *see also* Fed. R. Crim. P. 52(b).

## III.

### A.

We first consider Moya's sufficiency claim. He argues the evidence proves only that he legally owned a gun found with drug proceeds, not that he possessed the gun "in furtherance of" drug trafficking. While the evidence points both ways, we conclude a reasonable jury could have found Moya guilty.

Moya is right that every gun a drug dealer possesses does not necessarily "further" drug dealing. Our precedent rejects that notion. *See United States v. Ceballos-Torres*, 218 F.3d 409, 414 (5th Cir. 2000) (disagreeing with the proposition that "anytime a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs"). "What is instead required," we have explained, "is evidence more specific to the particular defendant, showing that his or her possession actually furthered the drug trafficking offense." *Ibid.* Signposts like these are useful:

> [1] the type of drug activity that is being conducted, [2] accessibility of the firearm, [3] the type of the weapon,

[4] whether the weapon is stolen, [5] the status of the possession (legitimate or illegal), [6] whether the gun is loaded, [7] proximity to drugs or drug profits, and [8] the time and circumstances under which the gun is found.

*Id.* at 414–15; *see also United States v. Walker*, 828 F.3d 352, 354–55 (5th Cir. 2016) (applying the *Ceballos-Torres* factors).

Here the signposts point both ways. *Pro* Moya: (1) the Raven .25 was legally possessed; (2) it was unloaded; and (3) the ammo stored with the gun may or may not have matched it. *Contra* Moya: (1) he was involved in drug trafficking; (2) the gun was near his bed; and (3) the gun was in a box with drug money. The kind of weapon is a wash: the Raven .25 is neither an "antique[] mounted on the wall," which would suggest "benign" possession, nor is it "particularly dangerous," which would suggest the opposite. *Ceballos-Torres*, 218 F.3d at 415; *see also United States v. Cousens*, 942 F.2d 800, 802–04 (1st Cir. 1991) (discussing the Raven .25); *cf. United States v. Riggins*, 524 F. App'x 123, 130–31 (5th Cir. 2013) (per curiam) (involving the "particularly dangerous" short-barreled shotgun). But the fact that it is a handgun, "a type of gun commonly used in drug trafficking," tips the scales against Moya. *United States v. Zamora*, 661 F.3d 200, 211 (5th Cir. 2011) (citing *United States v. Rose*, 587 F.3d 695, 702 (5th Cir. 2009)). Still, the jury heard Moya's story that the gun was given to him by his father years ago, that it was unconnected to his drug trafficking, and that he stored it unloaded on a shelf to keep it out of his children's reach.

The conflicting evidence does not fatally undermine the verdict. We ask only "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tinghui Xie*, 942 F.3d at 234 (cleaned up) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The answer is yes. A jury "may choose among any reasonable constructions of the evidence." *United States v. Masha*, 990 F.3d 436, 442 (5th Cir. 2021); *see also Walker*, 828 F.3d at 355 (noting a jury may reasonably convict "based on

No. 20-40393

some, but not all, of the [*Ceballos-Torres*] factors" (citing *United States v. Charles*, 469 F.3d 402, 406–07 (5th Cir. 2006))). This jury could have reasonably chosen the government's construction—namely, that an easily accessible pistol, stored by a drug trafficker along with his drug proceeds, was possessed "in furtherance of" drug trafficking. *See, e.g.*, *Charles*, 469 F.3d at 406–07 (recognizing a jury reasonably could have convicted where, *inter alia*, a disassembled pistol was "in close proximity" to drugs and "a large amount of currency").

We reject Moya's sufficiency claim.

## B.

We next consider Moya's challenge to the forfeiture. Moya was ordered to forfeit not only the $198,184 seized from his residence, but also $4 million "representing the amount of proceeds obtained by [Moya] as a result of the [trafficking conspiracy], for which [Moya] is personally liable." Moya argues the $4 million forfeiture was plain error because it makes him jointly and severally liable for the conspiracy's proceeds, contrary to *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). We agree.

The relevant statute is 21 U.S.C. § 853(a)(1), which provides that a person convicted of certain drug crimes, including Moya's, "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." In *Honeycutt*, the Supreme Court read the phrase "obtained . . . as the result of such violation" to mean that the defendant himself must "get" or "acquire" the tainted property. *Honeycutt*, 137 S. Ct. at 1632 (quoting RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 995 (1966)). This excludes "joint and several liability" for property obtained not by the defendant but by a co-conspirator. *Id.* at 1632–33; *see also id.* at 1634 ("The plain text and structure of § 853 leave no doubt that Congress did not incorporate [the] background principles . . . [of] conspiracy liability[.]").

To illustrate its holding, *Honeycutt* posed this hypo. A farmer pays a student $300 per month to sell the farmer's marihuana on a college campus; the farmer earns $3 million and the student earns $3,600. *Id.* at 1631–32. Under § 853(a)(1), the student would forfeit the $3,600 he "obtained as a result of" the drug trafficking. *Id.* at 1632. But not the remaining $2,996,400. *Ibid.* Those tainted proceeds were "obtained" by the farmer, not the student. *Ibid.* In other words, to make the student forfeit the entire $3 million would impose "[j]oint and several liability," which "would represent a departure from § 853(a)'s restriction of forfeiture to tainted property." *Ibid.*

Moya correctly argues that to make him forfeit the entire $4 million would cast him as the student in the *Honeycutt* hypo. The evidence shows that Moya earned up to $1,000 per kilo to distribute Don Roberto's narcotics. Moya made roughly $150,000 from these sales, while the rest of the money flowed south to Don Roberto. The conspiracy's estimated proceeds were between $3.9 and $5 million, which is where the district court derived the $4 million Moya was ordered to forfeit. This is the *Honeycutt* hypo to a T: Moya is being held jointly and severally liable for millions in tainted drug proceeds "obtained" by Don Roberto, not by Moya. *Cf. Honeycutt*, 137 S. Ct. at 1632–33 (under "joint and several liability . . . [t]he college student would be presumed to have 'obtained' the $3 million that the mastermind acquired").

We realize Moya must show plain error. But our circuit has decided that precisely this misapplication of *Honeycutt* qualifies. In *United States v. Sanjar*, we addressed on plain error review whether a participant in a Medicaid fraud scheme could be made to forfeit "the proceeds obtained by the entire conspiracy" (over $4 million) "rather than just the proceeds [the participant himself] received" ($120,000). 876 F.3d at 748–49. We held "*Honeycutt* renders th[is] joint-and-several award plainly erroneous" and found the other plain error factors were met. *Id.* at 749–50. So too here.

Even if we were reviewing the award *de novo*, however, the government would still not prevail. The statute provides that someone must

forfeit illicit proceeds whether he obtained them "directly or indirectly." 21 U.S.C. § 853(a)(1); *see Honeycutt*, 137 S.Ct. at 1633 (explaining "these adverbs refer to how a defendant obtains the property; they do not negate the requirement that he obtain it at all"). The evidence shows that Don Roberto obtained the vast majority of the trafficking proceeds through Moya's efforts. This means that Don Roberto, not Moya, obtained those proceeds "indirectly." Moya obtained only the $150,000 he personally acquired as profit for his trafficking for Don Roberto.

The government's counterarguments fail. First, the government argues that, unlike in *Honeycutt* and *Sanjar*, Moya's forfeiture order did not state it was imposing joint-and-several liability. True but irrelevant. Neither *Honeycutt* nor *Sanjar* suggests the problem was the forfeiture's label. The problem was making an individual liable under § 853(a)(1) for "property that was acquired by someone else." *Honeycutt*, 137 S. Ct. at 1632; *see also Sanjar*, 876 F.3d at 749 (*Honeycutt* means that § 853(a)(1) "does not allow [the defendant] to be responsible for any amount beyond the proceeds of the Medicare fraud that he obtained"). That is just what the forfeiture here does: it makes Moya responsible for drug proceeds that Don Roberto obtained.

Second, the government argues Moya was a "midlevel manager in the drug conspiracy," not a "lowly employee" like the defendant in *Honeycutt* or the student in the *Honeycutt* hypo.[2] But Moya's slot on Don Roberto's org chart is not what determines the scope of forfeiture under § 853(a)(1). Rather, it is the amount of tainted property Moya "himself actually acquired as the result of the crime." *Honeycutt*, 137 S. Ct. at 1635. To be sure, if Moya's high-level role in the conspiracy meant he personally took a bigger slice of the pie, then he could be made to forfeit that bigger slice. But the evidence

---

[2] The defendant in *Honeycutt* managed his brother's hardware store, from which they sold large quantities of a meth precursor. The government sought to hold the brothers jointly and severally liable for all proceeds under § 853(a)(1). *See* 137 S. Ct. at 1630–31.

No. 20-40393

excludes any notion that Moya "actually acquired" the entire $4 million reaped by the conspiracy. *Ibid.*; *see also Sanjar*, 876 F.3d at 749 (explaining *Honeycutt* "rejected the government's position that [§ 853(a)(1)] allowed joint and several forfeiture liability for conspirators").

Finally, the government relies on *United States v. Leyva*, 916 F.3d 14 (D.C. Cir. 2019), which found no plain error to make the defendant forfeit all $529.2 million proceeds of a cocaine trafficking operation. *Id.* at 30–31. The government misreads *Leyva*. The defendant there was "a leader of [the] organization," and the forfeiture pertained "only [to] proceeds from activities directly supervised by [him]." *Id.* at 31. And *Leyva* contrasted the situation where a "mid-level member" is wrongly attributed the total "proceeds earned by the entire cartel." *Ibid.* (citing *United States v. Cano-Flores*, 796 F.3d 83, 91 (D.C. Cir. 2015)). Moya is in the latter situation. The only way the entire conspiracy's proceeds could be attributed to him under § 853(a)(1) is to read into the statute a joint and several liability scheme already rejected by the Supreme Court.

Moya has therefore demonstrated the $4 million forfeiture order was plain error. And, as the government properly concedes, the remaining two plain error factors are easily met. *See Sanjar*, 876 F.3d at 750 (concluding third and fourth plain error factors are met when there is a "vast disparity" between the forfeiture and what *Honeycutt* allows) (citing *United States v. Austin*, 479 F.3d 363, 373 (5th Cir. 2007)). We therefore vacate the forfeiture order and remand to determine an award based on the property that Moya obtained as a result of the drug trafficking conspiracy.

## IV.

We AFFIRM Moya's conviction under 18 U.S.C. § 924(c)(1)(A). But we VACATE the $4 million forfeiture under 21 U.S.C. § 853(a)(1) and REMAND for further proceedings consistent with this opinion.

9